## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No. _____

SHAT ACRES HIGLAND CATTLE, LLC, a Vermont limited liability company,
JANET STEWARD, an individual, and
RAY SHATNEY, an individual

      Plaintiff(s),

v.

AMERICAN HIGHLAND CATTLE ASSOCIATION (AHCA), a South Dakota
nonprofit corporation with its principal place of business in Brighton, Colorado,
JACQUELYN CHOTKOWSKI, individually, and as a member of AHCA,
LAURA MCDOWELL-MAY, individual, and as a member of AHCA,
SPRING FLIGHT FARM, LLC, a New York limited liability company, and
SEAWIND MEADOWS, LLC, a Massachusetts limited liability company

      Defendant(s).

---

## COMPLAINT

---

COME NOW Plaintiffs, Shat Acres Highland Cattle, LLC, Janet Steward and Ray
Shatney (collectively "Plaintiffs"), by and through their attorneys Baker Law Group
LLC, to hereby submit the following Complaint against American Highland Cattle
Association ("AHCA"), Jacquelyn Chotkowski, Laura McDowell-May, Seawind
Meadows LLC, and Spring Flight Farm, LLC, and in support thereof state the
following:

    1.    This matter was originally filed on or about April 22, 2020, in the United
States District Court, District of Vermont. On or about January 13, 2021, Hon.

Magistrate Judge John M. Conroy dismissed the case for lack of personal jurisdiction over Defendant American Highland Cattle Association ("AHCA" or "the Association")

2.      Defendant AHCA's principal place of business is Brighton, Colorado and its registered agent for service is located in Brighton, Colorado.

3.      Plaintiffs' claims against the AHCA include federal antitrust violations under the Sherman Act. The private right of action to pursue antitrust claims is provided by the Clayton Act, which provides for venue and service of process against a corporation in the judicial district where a corporation may be found or transacts business.

4.      Thus, Plaintiffs have re-filed their action here in the United States District Court for the District of Colorado.

5.      The AHCA's governing documents are silent as to the choice of law governing disputes between the AHCA and its members. It is Plaintiffs' position that as Vermont residents they are entitled to the protections afforded them under the laws of Vermont and the herein matter should be determined according to Vermont law despite being adjudicated in this Colorado federal District Court venue.

## <u>PARTIES</u>

6.      Defendant AHCA is a South Dakota nonprofit corporation with its principal place of business in Brighton, Colorado.

7.      The registered agent for AHCA has an address listed with the Colorado Secretary of State in Brighton, Colorado.

8.     The AHCA Rules and Regulations as last updated April 10, 2018, provide for litigation of disputes between the AHCA and AHCA members in Colorado.

9.     AHCA has members in Vermont and transacts business in Vermont.

10.    AHCA has members in Colorado and transacts business in Colorado.

11.    Defendant Jacquelyn Chotkowski is a former President of the AHCA and a current member of the AHCA. On information and belief, she is a resident of the state of New York.

12.    Defendant Jacquelyn Chotkowski owns and operates Defendant Spring Flight Farm, LLC, a New York limited liability company, which is a member of the AHCA, advertises and sells cattle and cattle products in Colorado and is located at 321 Charles Storch Rd., Elmira, NY 14903.

13.    Defendant Laura McDowell-May is a former President of the AHCA and a current member of the AHCA. On information and belief, she is a resident of the state of Massachusetts.

14.    Defendant Laura McDowell-May owns and operates Defendant Seawind Meadows, LLC, a Massachusetts limited liability company, which is a member of the AHCA, advertises and sells cattle and cattle products in Colorado and is located at 54 Bristol St. #B, Dennis, Massachusetts, 02638.

15.    Plaintiff Janet Steward ("Ms. Steward" or "Janet") is a resident of Plainfield, Vermont, is a member of the AHCA, and is a managing member of Shat Acres Highland Cattle, LLC ("Shat Acres" or "the farm").

16.     Plaintiff Ray Shatney ("Mr. Shatney" or "Ray") is a resident of Plainfield, Vermont, is a member of the AHCA, and is a managing member of Shat Acres.

17.     Plaintiff Shat Acres is a Vermont limited liability company with its principal place of business in Plainfield, Vermont, is owned and operated by Ms. Steward and Mr. Shatney, is a member of the AHCA, advertises and sells cattle and cattle products, and conducts business in Colorado.

18.     Ms. Steward and Mr. Shatney are and at all relevant times have been dues-paying members of the AHCA.

19.     Shat Acres has been a dues-paying member of AHCA since 1967 and has been registered on AHCA's cattle registry for over fifty years.

## JURISDICTION AND VENUE

20.     Jurisdiction and venue are proper in this Court pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 22, which provides:

> Any suit, action or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

*Id.* Jurisdiction and Venue are proper because Defendant AHCA's principal place of business is in Brighton, Colorado, and 15 U.S.C. § 22 confers personal jurisdiction over the corporation served by authorizing service outside the state a corporation inhabits. *Goldlawr, Inc. v. Heiman*, 288 F.2d 579, 581 (2d Cir. 1961), *rev'd on other grounds*, 369 U.S. 463 (1962), and pursuant to the governing documents of the AHCA.

4

21.     Counsel for Plaintiffs have made numerous attempts and requests of Defendant AHCA to commence mediation in order to expeditiously and efficiently resolve the herein matter. These attempts were ignored or dismissed by AHCA. Consequently, Plaintiffs file the herein action.

## BACKGROUND AND HISTORY OF SHAT ACRES

22.     Shat Acres is a family-owned farm in Plainfield and Greensboro Bend, Vermont, which is in the business of breeding and selling Highland cattle.

23.     Highland cattle are a breed of cattle which originated in Scotland and were imported to the United States in the early 20th century.

24.     Ms. Steward and Mr. Shatney are a married couple who currently, and at all times relevant to this Complaint, own and operate Shat Acres, an organization dedicated to the preservation of this unique breed of cattle. Shat Acres' herd is a "closed herd" that preserves the lineage of this particular breed and is descended from the first Highland bull imported from Scotland.  Indeed, Shat Acres is the oldest registered herd of Highland cattle in the United States.

25.     In addition to selling beef, Plaintiffs breed cattle and exhibit them at fairs and AHCA point shows nationwide and sell cattle and cattle semen for breeding purposes throughout the United States, Canada and the world.

26.     Mr. Shatney's father devoted his life to the farm, and asked Ray to save the Highland fold in 2001 when he could no longer manage its operation and it had fallen into bankruptcy.

27.     During all relevant time periods to this matter, Plaintiffs Janet and Ray have been responsible for all aspects of operation and maintenance of Shat Acres' 150 cattle herd. They have no employees.

28.     Prior to working full time on the farm, Janet was a full-time educator for thirty years, recognized as the Vermont Teacher of the Year in 2002 and an American Star of Teaching in 2004.

29.     Prior to working full time on the farm, Ray operated a tree service business for twenty-three years.

30.     Plaintiffs have also volunteered their time serving in local organizations, such as Ray's 40 years of service on Greensboro Volunteer Fire Department and Janet's service as Chair of the Town of Plainfield Select Board and on Vermont state regulatory bodies related to the field of education.

31.     Shat Acres' Cinnamon Raisin was the most highly decorated Highland cow in the United States, garnering over a dozen Grand Championships, several Supreme Champions of show and multiple Grand Champion Produce of Dam awards.

32.     Shat Acres has won four National Western Grand Championships, two Reserve Grand Championships and two Roll of Excellence Female awards.

33.     Shat Acres, and its associated business Greenfield Highland Beef, were named the 2016 Small Business Association Vermont Family-Owned Business of the Year.

34.     Shat Acres has been specifically recognized by all three members of Vermont's United States Congressional delegation for their service to Vermont consumers and their contribution to the Vermont economy.

35.     Shat Acres was recognized by Vermont's Secretary of Agriculture as "putting Vermont on the map by raising the best Highlands in the United States."

36.     The Vermont Agency of Agriculture uses Shat Acres pastures to demonstrate how to positively effect intensive grazing.

37.     Plaintiffs have regularly contributed items for AHCA auctions for the Association, its Junior Members, and the Highland Cattle Association. Items contributed to these auctions have raised thousands of dollars for Defendant AHCA. Plaintiffs have received multiple commendations and appreciation letters from Defendant AHCA's employees, Board of Directors, Regional Associations, and AHCA members for their service to the organization. The AHCA has acknowledged that "the Shat Acres name has long been a symbol of quality recognized all over the Northeast. We appreciate the many years you have produced cattle that have such a positive impact on the breed." Shat Acres has registered over 470 head of Highland cattle with AHCA, which is more cattle than almost any other AHCA breeder. Shat Acres has been a dues paying member of AHCA since 1967 and have been registered on AHCA's cattle registry for over fifty years.

38.     Since 1967, Shat Acres Highland cattle have been shared with the public at over 500 venues, including Fairs, AHCA Point shows, hospitals, schools and

juvenile detention centers. Shat Acres Highland cattle have been presented to several hundred thousand spectators at shows and fairs.

39.     Shat Acres' Highland cattle have been sold all over the United States and the world, including Australia.

40.     Shat Acres regularly hosts visitors to their Highland farm from throughout the United States and the world, including recently a contingent of forty farmers from Belgium.

41.     Shat Acres has been regularly chronicled by print and television news media for their awards and multiple Grand Championships at AHCA shows and their history and contributions to Vermont agriculture.

42.     Shat Acres has more media postings on the AHCA website's "Members in the Media" section than any other AHCA breeder.

43.     Shat Acres regularly donates beef to the Vermont Food Bank, Senior Citizen Centers, Meals on Wheels, Glean, Town Meeting meals, Fire Department and Rescue Squad events, school fundraising dinners and auctions.

44.     Shat Acres beef has also been delivered to the White House and been prepared and served by professional chefs at large public events for hundreds of attendees.

45.     Plaintiffs' Highland beef recipes have been published in multiple cookbooks were featured in a nationally televised cooking show, preparing and serving Highland beef.

46.     Plaintiffs are also very active locally and in the region. Shat Acres, for over fifty years, has provided a cow and calf to "McDonald's Farm" for ten days, at the Champlain Valley Exposition, the largest County Fair in Vermont.

47.     Plaintiffs also volunteer their time serving in local organizations, such as Plaintiff Shatney's 40 years of service on Greensboro Volunteer Fire Department and Plaintiff Steward's service as Chair of the Town of Plainfield Select Board and on Vermont regulatory bodies related to the field of education.

48.     Carroll and Leona Shatney, Ray's parents, have been inducted into the AHCA Highland Hall of Fame.

## BACKGROUND OF THE AHCA

49.     AHCA is a trade association founded in 1948, which regulates the breeding and showing of Highland cattle in the United States with the stated purpose of preserving the integrity of the breed and assisting members in creating and maintaining the value of their Highland cattle stock.

50.     In return for paying membership dues and other fees to AHCA, the association covenants with its members to represent their interests with respect to maintaining the value of the Highland breed.

51.     AHCA further covenants with its members to treat all members equally and without favoring the interests of certain members over others.

52.     All actions taken by AHCA with respect to membership, cattle registry, discipline, or other actions are taken by agreement by and between, as well as through, its members, officers and committee members.

53.     Plaintiffs are long-standing members of AHCA and have served AHCA in numerous roles over the years, including as members of the Board of Directors and as members and Chairs of multiple committees. Plaintiffs have also been members of the AHCA Beef Marketing Panels, the National Western Stock Show Meeting Master of Ceremony, AHCA Convention speakers, Regional Contributors to the official AHCA quarterly publication (the "*Bagpipe*") and have authored numerous articles published in the *Bagpipe*.

54.     Defendant AHCA maintains and operates the principal national breed registry for Highland cattle. The breed registry is a list of Highland cattle in the United States certifying the pedigree and purebred/crossbred status of all cattle listed on the registry.

55.     For cattle to be listed on the registry, the owners of the cattle must be current, dues-paying members of AHCA.  A cattle owner cannot register an animal on the AHCA Highland registry if the owner is not a current member of AHCA.

56.     An animal which is unregistered on the AHCA registry has significantly less breeding and resale value than a registered animal.

57.     The AHCA organizes and sponsors livestock shows, referred to as "point shows," where Highland cattle are shown to judges and compete for awards.

58.     Animals that win championship awards at AHCA point shows and place high on the Role of Excellence have significantly higher breeding and resale value than animals that do not earn such awards and placements.

## SHAT ACRES SUCCES AT AHCA SHOWS

59.     Although Shat Acres Highland Cattle had been exhibited and won prizes at local fairs since 1967, Shat Farms did not begin taking their animals to AHCA national shows until Ray began to do so in 2001.

60.     Shat Acres began having immediate success.

61.     The National Western Stock Show ("NWSS") is the biggest Highland show in the United States with, at times, over two hundred Highlands entered annually and thirty to forty Highland breeders represented.

62.     In 2004 Plaintiffs attended the NWSS in Denver, Colorado. In 2004 Plaintiffs' Shat Acres Cinnamon Swirl was named Grand Champion Female at the NWSS.

63.     Between 2004-2017, Plaintiffs won over 60 individual category or show championship awards with 22 different animals.

64.     Over that same time period, Plaintiffs also won numerous overall herd, breeder and exhibitor awards.

65.     Defendants' harassment and anticompetitive conduct including false and fabricated ethics complaints and their unfair and unwarranted investigation

proceedings described *infra*, forced Plaintiffs off the competitive field from 2015 to 2017.

66.    After their complete exoneration by the AHCA Board of Directors, in 2017, Plaintiffs felt safe to show their animals and began showing their cattle at AHCA point shows once again, until the targeting, harassment and Kafkaesque investigative proceedings at the AHCA resumed in 2018 and once again forced Plaintiffs out.

67.    In 2017, which was the last year Plaintiffs felt safe to show their Highland cattle due to Defendants' 2018 conduct described *infra*, Plaintiffs attended five AHCA point shows.

68.    Plaintiffs' Shat Acres cattle won Grand Champion at every one of the five shows they attended in 2017, with eight different animals.  Plaintiffs were also awarded the Premier Breeder, Premier Exhibitor and Supreme Champion of Show awards.

69.    Shat Acres' Cinnamon Raisin is the most highly decorated Highland cow ever in the United States, garnering over a dozen Grand Championships and several Supreme Championships.

70.    Plaintiffs have won dozens of Grand Championships, including many at the NWSS.

71.    Plaintiffs' cattle have also won multiple Roll of Excellence awards.

## PREPARATION OF HIGHLAND CATTLE FOR SHOW

72.     Plaintiffs are proponents of showing Highland cattle in the traditional manner in which Highland cattle have been presented throughout the world for over two centuries.

73.     Highland Cattle have been shown to the public at competitions throughout the world since at least the 1800's. Judging has been based on published breed standards, which many countries' associations have in place for Highland Cattle.

74.     Breed standards focus on characteristics of the Highland breed such as frame size, strong feet and legs, level topline, and the unique traits of the breed: their long horns and long hair of "great profusion."

75.     Throughout most of the world, and, until recently, in the United States as well, Highland cattle are shown in their natural coat, with preparation for the show ring being very minimal--bathing the animals and perhaps removing a few errant belly hairs being the extent of the grooming process.

76.     The American Highland Cattle Association has never developed its own breed standard, and for years relied on those previously published by the Highland Cattle Society of Scotland, where the breed originated, which were based upon showing the animals in their natural coat.

77.     Since AHCA breeders began participating at AHCA point shows, and until very recently, Highland cattle have been shown in their natural coats with minimal trimming of their long hair.

78.     Heavy coats and copious hair cover has been an admired and desired trait by AHCA breeders for decades for which the animals were bred as a sign of healthy cattle and in recognition of Highland breed standards.

79.     AHCA point shows were a place of comradery, where breeders assisted each other with their cattle and enjoyed spending time with breeders from near and far.

80.     In 2008, an AHCA member hired a professional groomer well-known by judges throughout the United States for her expertise and skill in preparing commercial beef breeds for the show ring.

81.     This groomer was engaged to alter the member's animals to make them appear more like other commercial beef cattle, even removing the Highlands' facial hair and eyelashes.  This practice is known as "shaving", "clipping" and/or "blocking."

82.     Due to the relative scarcity of Highland cattle in comparison to other cattle breeds in the United States, judges at shows in the United States who are unfamiliar with the unique traits of the Highland breed often placed Highland cattle who were clipped, blocked and shaved to look like more commercial breeds over those who exhibited excellence according to Highland breed standards.

83.    As a result of this misjudging by commercial cattle judges, said groomer's employer became very successful in showing his cattle.

84.    Some Highland breeders began emulating this manner of showing cattle by clipping and shaving their animals.

85.    Most Highland breeders, including Plaintiffs, still felt it important to preserve the unique traits of the Highlands by not clipping and shaving their animals even though the shaved and clipped animals were generally being selecting as Champions.  In addition, blocking is considered by many to be an inhumane practice due to the cattle's difficulty regulating body temperature. Despite the trend in awards being given to blocked animals, Shat Acres refused to shave their animals and yet continued to be competitive in the show ring.

86.    In 2009, then AHCA President Jacquelyn Chotkowski recognized the harm to the breed being caused by this trend of "blocking" Highlands entering the show ring, and to the AHCA by the discord it was causing among AHCA members.

87.    The Winter 2009 *Bagpipe* contained a report of the AHCA Show Committee, representing its decision that every judge at an AHCA show will be sent information regarding the Highland breed informing them of the "unanimous agreement that blocking is to be discouraged as it drastically changes the unique appearance of the Highland breed."

88.    In 2009, Defendant AHCA developed its first Long Range Plan ("LRP"). In the "Show" section of the LRP, the first bullet-point states that "Cattle will be

shown in the natural (i.e. unclipped) coat condition (reinforces role as a production breed)."

89.    The AHCA also developed and published a "Policy Statement Concerning the Fitting of Highland Breeding Cattle for the Show Ring" around the same time, in 2009. The policy states, in relevant part:

> "Attempting to alter the physical appearance of Highland cattle breeding show stock by excessive removal of hair is not an acceptable procedure at any ROE recognized Highland cattle show … excessive clipping or blocking will not be tolerated in the show ring except for market animals …."

90.    Defendant Chotkowski herself issued a directive in the Winter 2010 *Bagpipe* in the President's message, stating that AHCA members should "[r]ise up to the challenge and bring your cattle to Denver without having clipped them up…"

91.    After AHCA's swift response to his blocking and shaving his cattle, said groomer's employer stopped showing Highland cattle at AHCA point shows.

92.    For several years after publication of the LRP, the clear policy announcement of 2009 and Defendant Chotkowski's 2010 President's message, there was relative calm in the American Highland Cattle Association.

93.    Almost all cattle were again being shown in their natural coats, with comradery among AHCA members.

94.    Plaintiffs have always believed Highlands should be shown as they have for centuries, with their long horns and long hair.

95. Plaintiffs have never clipped, shaved or blocked their Highland breeding stock.

## DEFENDANT JACQUELYN CHOTKOWSKI'S CONTROL OF AHCA

96. Defendant Jacquelyn Chotkowski has been a member of AHCA for over 20 years and operates Spring Flight Farm, LLC in Elmira, New York.

97. Jacquelyn Chotkowski has been an active member of AHCA for many years. She has served on the Board of Directors and as President of the Association. She has also been, and continues to be, a long-term member of the AHCA Executive and Governance Committees.

98. For several years, she was the associate editor and has subsequently served as the editor and publisher of the *Bagpipe*, AHCA's official newsletter and member magazine. As editor and publisher, Chotkowski exercised complete control over the contents of the *Bagpipe*.

99. It is widely believed among AHCA members that, despite who may be serving as an officer or Board member, Defendant Jacquelyn Chotkowski, and those allied with her, control the Association and all aspects of it.

100. AHCA members refer to Jacquelyn Chotkowski as AHCA's "New York office" and commonly comment that Association actions must meet the approval of the "New York office" before being sanctioned by AHCA's Board.

101. Despite her decades of membership in the Association and history of showing her cattle, Jacquelyn Chotkowski's Spring Flight Farm, LLC has never won

a NWSS Grand Championship or achieved comparable success to Plaintiffs' at AHCA point shows.

102.   In or about 2016, a Highland breeder from New Hampshire hired the same above-mentioned groomer who had previously been hired to block and shave Highland cattle in 2008.

103.   This groomer is known and recognized across the United States for her skills at fitting, enhancing and altering the appearance of a beef animal to make it more attractive to ring judges.

104.   As in 2008-2009, the animals prepared by this groomer looked more like commercial beef cattle that judges were accustomed to seeing and began winning championships at AHCA shows.

105.   In 2016, Defendant Chotkowski became part owner of a Highland bull owned by the New Hampshire farm that hired said groomer, and the groomer prepared that bull co-owned for the show ring.

106.   Although having previously achieved only sporadic and marginal success, this New Hampshire farm began having consistent success after hiring the groomer and even won Grand Championships at the NWSS and at AHCA shows.

107.   Notably, this breeder's success in 2016 came during Plaintiffs' forced absence from the show ring due to Defendants' wrongful conduct.

108.   Other Highland breeders took notice of these Highlands success and began emulating the show preparation techniques of this groomer.

109.   The same discord and controversy created over "blocking" in 2008-2009 returned to AHCA.

110.   At the 2016 KILE show in Harrisburg, Pennsylvania, where Defendant Chotkowski's bull had been prepared for the show ring by up to six groomers on one animal, including the above-mentioned groomer, Defendant Chotkowski was involved in a loud, verbal disagreement with multiple other breeders who were concerned about the excessive hair removal on that animal. Plaintiffs observed but were not involved in the conflagration.

111.   Defendant Chotkowski's actions during that altercation were so offensive that she was reported in writing by several breeders to the AHCA Board of Directors and the Ethics Committee.

112.   The complaints were ignored by the AHCA.

113.   The AHCA justified its own inaction by claiming that it was not AHCA's role to govern such conduct.

114.   At that show, the above-mentioned groomer also assisted with the preparation of cattle owned by another AHCA member, Defendant Laura McDowell-May and her family farm.

115.   At the 2017 NWSS, the bull co-owned by Defendant Chotkowski and prepared again by the above-mentioned groomer, garnered Reserve Grand Champion Bull.

116.   Following those successes, Defendant Chotkowski's willingness to own and show an animal that is "blocked" was markedly different from her previous position against clipping and blocking expressed in her above-referenced 2010 Presidential statement, and in the above-mentioned 2009 LRP and Policy Statement that were issued during her tenure as AHCA President.

117.   Most breeders believe they cannot compete with blocked and altered cattle, and so many AHCA members have either dropped their membership or stopped showing cattle or begun showing cattle which are now clipped and shaved for the show ring.

118.   Despite choosing not to alter the natural appearance of their cattle, Plaintiffs, however, continued to garner Championship awards after returning to the show ring in 2017.

## JACQUELYN CHOTKOWSKI'S HBMA & QHB PAY-TO-PLAY ORGANIZATIONS vs. PLAINTIFFS' BMC FREE MEMBERSHIP ORGANIZATION

119.   In 2007, Plaintiffs realized that the Highland herd could not be sustainably supported without selling beef in addition to their champion breeding stock, so they began selling their Highland beef commercially, under the trade name Greenfield Highland Beef.

120.   AHCA had been trying to produce marketing materials for Highland beef to be used by members for several decades. In 2009, the AHCA included in its written AHCA Long Range Plan a commitment to create "Highland beef promotional

programs sponsored by the Highland Beef Marketing Association ("HBMA") with at least 20 sponsoring beef producers … an annual budget of more than $100,000.00."

121.   Jacquelyn Chotkowski, who was AHCA President at the time, founded and took control of the HBMA, adopting a "pay to play" approach and demanding thousands of dollars in fees to join.

122.   No members of the AHCA ever joined the HBMA.

123.   When it became clear than neither ACHA nor its members supported the HBMA, Jacquelyn Chotkowski became more actively involved in another organization, the Quality Highland Beef ("QHB") program.

124.   QHB was another AHCA "pay to play" marketing program that had begun in 1994.

125.   Despite its longevity, the QHB program met with minimal success. In 2005, despite its existence for over twenty years, QHB had only 68 members, less than 5% of AHCA's membership.

126.   Defendant Chotkowski became the Chair of the QHB Committee and initiated an intense promotional campaign to garner a broader share of AHCA's membership involved in this "pay to play" program.

127.    Dean Adams was sworn in as AHCA's President in June 2010, replacing Defendant Chotkowski, whose term limit had expired.

128.    In Denver, Colorado in January 2011, President Adams detailed a new Committee structure focusing on education, breed promotion and protection and beef marketing, to revitalize AHCA and encourage membership participation.

129.    In January 2011, Janet was appointed Chair of a newly formed AHCA Beef Marketing Committee ("BMC") due to her successful efforts marketing Highland beef since 2007 under the trade name Greenfield Highland Beef and her commitment to helping other Highland cattle breeders achieve success at marketing the animals for beef as well.

130.    The BMC under Janet's direction developed and provided marketing materials at no charge to any AHCA member.

131.    The BMC under Janet's direction also arranged to provide all members the opportunity to list a "Steak Icon" next to their name on the AHCA membership list to let others know which breeders were selling Highland beef.

132.    In its first year, over seventy AHCA members chose to participate in the BMC's marketing initiatives. By 2015, eighty-nine AHCA members chose to participate in BMC marketing initiatives. By contrast, in 2015, membership in QHB, the twenty-year-old "pay to play" program Jacquelyn Chotkowski was promoting, declined to 47 members.

133.    Under Janet's leadership, the BMC achieved remarkable success and growth in developing resources and partnerships to aid AHCA members in marketing their Highland beef products.

**DEFENDANTS' MALFEASANCE AGAINST PLAINTIFFS IN 2015, AND
ITS SUBSEQUENT EXPOSURE PUT THE AHCA ON NOTICE OF
CHOTKOWSKI'S AND MCDOWELL-MAY'S TARGETING, DEFAMATION
AND ANTI-COMPETITIVE CONDUCT AGAINST PLAINTIFFS**

134.   During her tenure as Chair of the BMC, Janet made regular progress reports to the AHCA Board, to AHCA members at its conventions, and in the *Bagpipe*.

135.   At every Board meeting when Janet made a BMC report, Jacquelyn Chotkowski was disruptive, abusive, obstructive, threatening and defamatory.

136.   Each time Plaintiff Steward reported to the AHCA membership regarding the BMC Committee, Chotkowski would leave the room or turn her chair so that her back faced the presentation podium.

137.   Following a Board meeting in January 2015 in Denver, Colorado, Chotkowski waited for Plaintiff Steward in the hallway outside the meeting room and cornered her against a wall.  Chotkowski stated that she would do everything in her power to prevent the BMC from creating beef marketing materials for AHCA members.

138.   On March 19, 2015, during a Breed Protection & Promotion (BP&P) Committee teleconference, Chotkowski repeatedly interrupted Plaintiff Steward while she was giving her Beef Marketing Committee report.

139.   During these interruptions, Chotkowski repeatedly, and falsely, told the subcommittee that Plaintiff Steward was lying.  Chotkowski later admitted this conduct.

140.   While the nine members present for the teleconference were witnesses of Defendants' verbal attacks, Plaintiff Steward reported the verbal attacks to no one else.

141.   At the time of the teleconference and Chotkowski's verbal assaults, Plaintiff Shatney was serving as a member of the AHCA Board of Directors and the Beef Marketing Committee.

142.   On March 29, 2015, AHCA's then President Deb Nelson telephoned Plaintiff Shatney and told him that the AHCA Executive Committee had met and instructed her to issue an official verbal reprimand to him for being a troublemaker.

143.   Nelson also informed Plaintiff Shatney that he could no longer serve on any AHCA committees.

144.   Nelson further informed Plaintiff Shatney that Plaintiff Steward was also being officially reprimanded under the direction of the Executive Committee for being a liar.

145.   Ms. Nelson falsely, deliberately and wantonly misinformed Ray that due to the Executive Committee's action, he could no longer serve on any AHCA committees. She falsely, deliberately and wantonly misinformed Janet that she was officially reprimanded for "being a liar". There were no such reprimands and punishments issued by the AHCA Executive Committee, and Ms. Nelson knew this at the time she misinformed Plaintiffs. Nevertheless, Ms. Nelson willfully and

wantonly misinformed Plaintiffs about their being disciplined and punished by the AHCA organization.

146.   That same day, Janet reached out to Executive Committee members to inquire as to the reasons for these alleged reprimands, and to request copies of the Executive Committee minutes. No response was provided.

147.   Janet then wrote the Board of Directors, requesting an explanation for the purported disciplinary actions and punishment, and demanded the relevant Executive Committee minutes.  No minutes or explanation were provided.

148.   Plaintiffs later discovered that the Executive Committee had neither met nor directed Ms. Nelson to issue an official reprimand of Plaintiffs. But rather, that it was Jacquelyn Chotkowski, on her own authority and in contravention of AHCA Bylaws, Rules and Regulations governing the issuance of discipline and punishment, who had instructed President Deb Nelson to inform Plaintiffs that they were being officially reprimanded and punished.

149.   At the next Board Meeting, on April 7, 2015, Janet once again raised her questions regarding the purported reprimand and punishment of herself and Ray. Jacquelyn Chotkowski and Vice-President Laura McDowell-May used the meeting to further threaten and defame Plaintiffs including threatening to bring **unspecified criminal charges** against Plaintiffs.

150.   Janet objected and inquired as to why she was being threatened and defamed in this manner. Jacquelyn Chotkowski shouted that it was because she was

"a [expletive deleted] pain in my [expletive deleted]".   President Nelson, in a Kafkaesque twist, claimed that Plaintiffs were being sanctioned for requesting minutes and making repeated inquiries regarding the above-discussed "reprimands".

151.   In response to the false accusations and threats of legal action being brought against them, Plaintiffs retained an attorney to represent their interests.

152.   AHCA member John McLaughlin, an attorney who provided legal advice to the Board of Directors, informed Plaintiffs' attorney that Plaintiffs' actions were injurious to AHCA and demanded that Plaintiffs issue a written apology to the Association and that Plaintiff Steward "kiss and make up" with Chotkowski.

153.   Despite the obvious conflict, an Executive Committee member then attempted to manipulate the composition of the Ethics Committee investigating the possible ethical violations of himself as member of the Executive Committee, as well as of Plaintiffs.

154.   On May 1, 2015 Nick Self, Chair of the Ethics Committee, emailed the AHCA Board seeking approval for the Ethics Committee to consist of Nick Self, Dean Adams, Sharon Green and John McLaughlin.

155.   As a result of the turmoil caused by Chotkowski, Nelson and McDowell-May, the Board of Directors authorized an Ethics Committee be convened to investigate the dispute between the Executive Committee, Jacquelyn Chotkowski, Ray and Janet to get to the bottom of this purported reprimand and punishment.

156.   On May 3, 2015, the Board approved the proposed Ethics Committee membership.

157.   After some time had passed without Plaintiffs' receiving an invitation to be interviewed by said Ethics Committee, Plaintiffs wrote to the Ethics Committee requesting to speak with them to assist with their investigation.  They received no response.

158.   Instead, in yet another blatant breach of Plaintiffs' due process rights by the AHCA, the Ethics Committee issued its report to the Board on June 14, 2015, stating that it had gathered all relevant information, had met on 5/4/15 and 5/18/15 and had completed over a dozen interviews, including of all the members being investigated **without having conducted an interview of either Ray or Janet**.

159.   Plaintiffs contacted the Board to let them know that the Ethics Committee **had not** interviewed them yet.  The Ethics Committee then set a date to interview Plaintiffs and provided Plaintiffs little more than **two (2) days' prior notice** of the interview – a transparent ploy to prevent Plaintiffs from obtaining legal counsel to protect their rights.

160.   Prior to their scheduled interviews, Plaintiffs requested they be provided the minutes of the relevant Committee meetings. They were told that, in contravention of AHCA governing documents, **no such minutes exist**.

161.   Plaintiffs were subsequently interviewed by teleconference by the Ethics Committee comprised of Nick Self, Chair, Dean Adams and Sharon Green.

162.   Despite the impropriety of the process and the emotional distress and economic loss resulting therefrom, the Ethics Committee report completely exonerated Plaintiffs of any wrongdoing. The Board voted unanimously to accept the conclusion and findings of the Ethics Committee.  Jacquelyn Chotkowski, on the other hand, was cited for inappropriate conduct and ordered to issue a written apology within 30 days.

163.   On the thirtieth day after the Board's directive, Plaintiffs received an email from Chotkowski with no greeting or signature, in which Chotkowski stated that her conduct was necessary to "interrupt the beef marketing report because of inaccuracies." No apology, no contrition nor any remorse were expressed. Instead, Chotkowski's email reproduced her false calumny.

164.   Janet's BMC March 19, 2015 report contained no inaccuracies whatsoever. Indeed, no inaccuracies in Janet's BMC reports have ever been suggested by any investigation and the specific report in question was approved unanimously by all members present, including Chotkowski, without amendment.

165.   Janet notified the Board of Chotkowski's failure to comply with their directive to issue an apology. However, the Board took no action in response to Chotkowski's failure to comply with the Board's order. Plaintiff received no response to her notification to the Board. The Board did not require that Chotkowski provide any further comment or the apology the Board had previously ordered.

166.    The AHCA's failure to take action to enforce its directive against Chotkowski and on behalf of Janet, emboldened Jacqulyn Chotkowski to continue her campaign of harassment, defamation and abuse of process. She continued targeting Plaintiffs and causing Plaintiffs to suffer severe emotional distress, humiliation, ridicule, ostracizing and fear of criminal prosecution by the AHCA through its officers, in addition to the economic harms involved in having to hire an attorney to represent them in AHCA's frivolous and capricious Ethics investigations, and the difficult financial and emotional decision to refrain from attending most AHCA point shows.

167.    Despite the above-described Ethics Committee's findings, Chotkowski and her allies continued to harass Plaintiffs and the Beef Marketing Committee while Janet served as Chair in an effort to cause its failure, the failure of Plaintiffs' business and to keep Plaintiffs away from AHCA shows and force them out of the AHCA.

168.    McDowell-May, while President of AHCA, and Chotkowski continued to demand that the Board refuse to fund requests from the Beef Marketing Committee, stating the work they were doing was a waste of time due to the existence of the QHB program.

169.    President McDowell-May and Chotkowski also repeatedly, and falsely, told the Board that the work the BMC was doing was redundant, despite there never having been produced beef marketing materials available free of charge to all AHCA members previously.

170.    Upon information and belief, President McDowell-May and Chotkowski were heard in private conversations insulting and using derogatory language towards Board members for supporting the work of the BMC.

171.    Despite these obstacles, in 2018, the BMC created and made available to all AHCA members professionally designed beef marketing materials.

172.    All photographs of Highland cattle, cuts of beef and recipes on the new beef marketing materials were donated for AHCA's use by Plaintiffs, as no other members offered to assist with these materials.

**AHCA'S FAILURE TO HOLD CHOTKOWSKI ACCOUNTABLE EMBOLDENED HER TO BE MORE AGGRESSIVE IN HER TARGETING OF PLAINTIFFS AND USE THE ASSOCIATION'S POWER TO COMMIT ANTI-COMPETITIVE ACTS**

173.    Plaintiffs have been informed by former AHCA Board members and officers that had the Board held Chotkowski accountable in 2015, the defamation, harassment, and anti-competitive actions Plaintiffs suffered in 2018 at the hands of Chotkowski and her allies, would not have occurred.

174.    In 2018, following Plaintiffs' extremely successful year in 2017 showing their Highland cattle, the anticompetitive actions, attacks and harassment against Plaintiffs began anew.

175.    On December 18, 2017, Josh Krenz emailed all members of the BMC that he had been appointed to Chair a newly convened AHCA Long Range Plan (LRP) Committee. The purpose of the Committee was to gather feedback on AHCA's most current long-range plan, developed in 2009.

176.   On January 3, 2018, Krenz emailed a copy of the then-current LRP to all BMC members, including Plaintiffs, requesting feedback by January 15, 2018.

177.   In response to questions by members of the Facebook Highland Cattle Breeders Group seeking information about where AHCA policies might be found, Plaintiff Steward posted AHCA documents and previous *Bagpipe* articles.

178.   On May 23, 2018, Plaintiffs were informed by the AHCA that alleged "complaints regarding your conduct were referred to the Ethics Committee for consideration."

179.   AHCA's Operations Manager, Ginnah Moses, wrote Plaintiffs stating that "three categories of complaints regarding your conduct were referred to the Ethics Committee for consideration." One category referred to conduct in the show ring, one to conduct at a sale auction, and one in reference to the above-mentioned Facebook post, stating that Janet had "willingly and intentionally published outdated material with the intent to create discord and harm to the association."

180.   This later charge referred to the Facebook posting by Janet in January of 2018 that simply contained portions of: (1) AHCA's current LRP that had been sent to her by LRP Committee Chair Krenz, (2) former President Jacquelyn Chotkowski's 2010 presidential message previously discussed *supra*, and (3) the AHCA's most current policy regarding preparation of Highland breeding stock for presentation at AHCA point shows.

181.   The alleged complaint lodged against Janet's post, it later became known to Plaintiffs, were the result of AHCA President Laura McDowell-May's making false claims to members of the AHCA's Governance Committee, including the chair of the Ethics Committee, stating that she had received several letters, phone calls and texts complaining about Plaintiff Steward's post.

182.   The Governance Committee decided that it was not the duty of the Governance Committee to investigate the alleged conduct of a member in social media settings.

183.   The Governance Committee minutes also noted that no issues were pending with the Ethics Committee at that time.

184.   At a subsequent Governance Committee meeting in March, 2018, the Committee was informed that, despite no vote being taken to authorize such an action, investigations into two ethics issues were being undertaken.

185.   Despite attempted inquiry at that meeting, members of the Governance Committee who were not aware of the ethics investigations prior to the meeting were not provided any details.

186.   In violation of AHCA Rules and Regulations, and in contrast to the precedent, the approval of the Board of Directors was **not** sought for such an investigation and, indeed, the Board was not informed that an investigation of Plaintiff Steward was being conducted.

187.   In addition to false reports of complaints regarding Plaintiff Steward's Facebook posts, the Ethics Committee also received false reports that Plaintiff Steward was responsible for ethics violations by her conduct during a livestock show.

188.   The Ethics Committee purported to dismiss these allegations on the dual bases that it should not regulate the personal conduct of AHCA members and that the issue was prior to AHCA adopting the International Association of Fairs and Exhibitions ("IAFE") Code of Show Ring Ethics.

189.   However, it became clear that the allegations were dismissed because they were demonstrably false and fraudulent when made.

190.   Neither AHCA nor any other breed association "adopts" IAFE Rules and Regulations. AHCA point shows had been operating under IAFE Rules and Regulations for decades.

191.   During point shows, animals are judged according to the standards applicable to the shows and the shows are conducted in accordance with the Rules set forth by the IAFE.

192.   IAFE Rules have long been in place and have governed AHCA shows for decades.

193.   IAFE Rules have been used at the National Western Stock Show for approximately 30 years.  In order to show animals at a show where IAFE Rules are in place, the breeder is required to sign an agreement to abide by those rules on the AHCA entry form.

194.   This agreement to abide by IAFE Rules is required for all AHCA sanctioned shows and is evident on all AHCA sanctioned show applications.

195.   The requirement that exhibitors at shows follow IAFE Rules is disseminated to AHCA membership by other avenues as well. For example, the Spring 2010 *Bagpipe* includes "AHCA Rules for ROE Sanctioned Shows" and states that "Exhibitors agree to abide by the IAFE (International Association of Fairs and Expositions) National Code of Show Ring Ethics." In the Spring 2017 *Bagpipe*, the Show Committee Update included an article entitled "The IAFE Code of Show Ring Ethics Background and Explanation", followed by a printing of the entire IAFE Code of Show Ring Ethics.

196.   Notwithstanding all this, Defendant AHCA printed in the Summer 2019 *Bagpipe* the false claim that "[t]he AHCA Board has recently adopted the International Association of Fairs and Expositions Code of Show Ring Ethics" in attempt to provide cover for the fraudulent claims of ethical violations made against Plaintiffs discussed above.

197.   Rather than make it known that the accusations against Plaintiff were verifiably false, the AHCA conspired to deceive Plaintiffs and Association members by positing that some of the complaints could not be investigated because IAFE rules had not yet been adopted by the AHCA.

198.   AHCA then conspired to deceive Plaintiffs and its members into believing AHCA had "decided to adopt" IAFE Rules and Regulations solely in order to justify its actions.

199.   Plaintiffs had not attended nor exhibited any of their cattle at an AHCA show since 2017.

200.   Plaintiffs' investigation has revealed that there were no irregularities or IAFE violations reported at the 2017 NWSS Highland Show – in any class, and certainly not in any class in which Plaintiff Steward was showing cattle.

201.   Plaintiffs' investigation has revealed that no one lodged any complaint whatsoever to the 2017 NWSS Show Superintendent about any alleged actions by Plaintiffs while showing cattle at the 2017 NWSS.

202.   Plaintiffs' investigation has revealed that the 2017 NWSS Sale Auctioneer received no reports of inappropriate occurrences by anyone, and certainly no reports of inappropriate conduct by Plaintiff Steward.

203.   Plaintiffs have been informed that at the conclusion of the May 15, 2018 Governance Committee meeting, it was the understanding of Governance Committee members that the unanimous decision was to inform the AHCA Board that there were no ethics complaints that would be recommended to be addressed at that time.

204.   Notwithstanding all this, on May 23, 2018, Plaintiff Steward received notice from Defendant AHCA, through its employee Ginnah Moses, that she was being investigated for ethics complaints lodged against her.

205.    The Ethics Committee designated in the May 23, 2018 email from Moses consisted of Nick Self and Rick Martson.

206.    Upon receiving the May 23, 2018 notification of the Ethics Committee investigation, Plaintiffs wrote to the Ethics Committee and Board of Directors to request copies of the complaints, the identity of the complainants and the show and sale at which Plaintiff Steward's alleged conduct led to these purported complaints, since Plaintiffs had attended no shows in 2018.

207.    Plaintiffs also notified the Ethics Committee and the Board of Directors that the accusations against them substantially impacted their businesses and livelihood.

208.    Plaintiffs also reminded the Ethics Committee that they had been falsely and unfairly targeted by AHCA officers and members before for fraudulent ethics violations and had been completely exonerated.

209.    Plaintiffs were informed by Board members that the Board was not aware of any complaints filed against Plaintiff Steward, that the Board had not authorized any Ethics investigation of Plaintiff Steward and that the Board had not convened an Ethics Committee to perform any investigation.

210.    When no response was made to her previous request, on May 28, 2018, Janet again requested copies of the purported complaints against her so that she could formulate her best response to them.

211.   On May 29, 2018, Plaintiffs received a Kafkaesque email from AHCA President Laura McDowell-May stating that "[m]atters before the Ethics Committee are confidential".

212.   President McDowell-May's email of May 29, 2018 also incorrectly informed Plaintiffs that "[m]atters before the Ethics Committee are … referred to the BOD … IF they decide whether to even move a matter forward."  This statement is in direct violation of AHCA's Rules and Regulations as they existed at the time, which required Board approval **before** any Ethics investigation was conducted. Indeed, the protocol requiring BOD approval of an investigation before an Ethics Committee conducts an investigation **was** followed during in 2015 when Defendant Chotkowski and her allies' false and fraudulent statements prompted an investigation.

213.   Plaintiffs requested a hearing before the Board, as contemplated by the Rules and Regulations.  On June 22, 2018, the Board, made aware for the first time of an investigation, but without the details of the complaints or investigation, voted to authorize the Ethics Committee to conduct the requested hearing.

214.   One or more Governance Committee members who were present at the June 22, 2018 Board meeting were surprised by the announcement regarding an investigation as their understanding from an April Governance Committee meeting was that it had been decided that no ethics investigation was warranted.

215.   The June 22, 2018 report of the Governance Committee to the AHCA Board confirmed that all Ethics complaints are required to be in writing and signed, either by letter or email.

216.   Prior to the hearing, Plaintiff Steward again requested on multiple occasions copies of the complaints and any and all relevant meeting and committee minutes where the issues were discussed.

217.   Plaintiff Steward's requests were routinely and repeatedly denied, in direct contravention of previous practice and stated policy.

218.   Plaintiffs inquired of the AHCA Board about these purported complaints and the alleged Ethics Committee referral, requesting copies of the alleged complaints, the identity of the complainants and the show and/or sale to which the purported complaints referred. Plaintiffs also notified the AHCA that they had previously been targeted by false claims of complaints being lodged against them, and that those accusations had substantially impacted their businesses, well-being and livelihood despite Plaintiffs' eventually being completely exonerated of those defamatory charges.

219.   The Kafkaesque approach of the AHCA to Plaintiffs' due-process rights was again on display when, on August 29, 2018, the Ethics Committee informed Plaintiffs that they would **not be provided any documents** in response to their request for minutes and copies of the alleged complaints against them.

220.   Plaintiffs subsequently discovered that AHCA President Laura McDowell-May had once again falsely defamed Plaintiffs, intentionally misrepresenting to the Ethics Committee that she had received several letters, phone calls and texts complaining about Plaintiff Steward. **These allegations appear to have been a complete fabrication.**

221.   Plaintiffs were informed by the Board that, contrary to what they had been told on May 23, 2018, **no issues against them were pending with the Ethics Committee**. In fact, the Board members represented that the Board was not aware of any ethics complaints filed against Plaintiffs, had not authorized any investigation of Plaintiffs and had not convened an Ethics Committee to do so.

222.   Plaintiffs were also informed that **despite no vote being taken by the AHCA Governance Committee or by the AHCA Board to authorize such actions**, investigations into Plaintiffs alleged "ethics violations" were nonetheless being undertaken by individuals in an *ultra-vires* fashion.

223.   After Plaintiffs concerted efforts, renewed emotional distress and further economic damages including but not limited to legal costs, expenses and attorneys' fees, the Ethics Committee issued a statement that the above-described "ethics investigation" was dismissed.

224.   However, rather than publicly state that the accusations against Plaintiffs were verified to be false, the AHCA falsely and misleadingly stated that "some of the complaints" could not be investigated because IAFE rules had not yet

been adopted by the AHCA at the time of the alleged wrongdoing by Plaintiffs. **That statement is false and defamatory of Plaintiffs**. IAFE rules have been a part of AHCA shows for decades. Moreover, the "ethics investigation" was dismissed because the allegation that complaints had been lodged against Plaintiffs was demonstrably false and fraudulent.

225.    IAFE Rules were adopted at the NWSS approximately thirty (30) years ago.  To show animals at an AHCA show, breeders are required to sign an agreement to abide by IAFE rules. This agreement is required for all AHCA sanctioned shows and is clearly provided on AHCA show applications and on AHCA entry forms. *The Bagpipe,* AHCA's periodical, regularly published updates as well as the entire list of IAFE Rules (*See* e.g., Spring 2017, Spring 2010 issues).

226.    The findings of the Ethics Committee, once again completely exonerating Plaintiffs, were finally adopted by the Board, ending the second round of spurious charges against Plaintiffs, on **January 24, 2019**.

227.    Despite their eventual exoneration and the conclusion that these charges were frivolous, fraudulent and that it was inappropriate to even convene an investigation, reputational damage had already been done to Plaintiffs and continues to be done due to Defendants' refusal to openly acknowledge the charges were spurious.

228.    What's more, despite the fact that the ethics charges against Plaintiffs were supposed to be confidential, AHCA officers, directors and/or committee members

nonetheless leaked information that Plaintiffs had been charged with ethical violations, thereby causing Plaintiffs severe reputational harm that resulted in a dramatic drop in their sales of cattle to AHCA members.

229.   The complaints made by Defendants, similar to the 2015 complaints, were made in order to harass, embarrass and abuse Plaintiffs in order to prevent them from taking part in AHCA point shows or attending AHCA events, to drive them from the AHCA, to the potential financial benefit of Defendants Chotkowski, McDonnell-May and their respective cattle farms.

230.   Defendants' targeting and harassment of Plaintiffs for alleged ethics violations was frivolous, capricious and designed to incur sanctions against and removal of Plaintiffs from the Association.

231.   Defendants' anticompetitive conduct, targeting and harassment of Plaintiffs was designed to, and did, cause pain and suffering and humiliation to Plaintiffs and were successful in achieving Defendants' intent to cause other AHCA members to sever personal and professional relationships with Plaintiffs.

232.   Defendants' conduct was further designed to, and did, cause other AHCA members to question if Plaintiffs were ethical breeders, and to decrease sales of Shat Acres breeding stock, reflected by a 30% drop in Plaintiffs' breeding sales in 2018, with not one animal sold to a member of the Association.

233.   Due to Defendants' conduct, no AHCA member purchased any Shat Acres cattle in 2018 and 2019, dramatically decreasing Plaintiffs' economic return on its breeding stock.

234.   Defendants' anticompetitive behavior, targeting and harassment of Plaintiffs for demonstrably false ethics violations was designed to, and did, create an environment in which Plaintiffs could not bring their champion Highland cattle to AHCA point shows.

235.   Plaintiffs suffered serious and severe emotional distress as well as economic damages due to the targeting, defamation, humiliation, harassment, and lack of due process they endured by and through the AHCA, its officers, directors, members, committee members and in particular Jacquelyn Chotkowski and Laura McDowell-May.

236.   Defendants, and each of their defamation, humiliation, harassment, intentional infliction of emotional distress, lack of due process and anti-competitive actions, caused Plaintiffs damages including emotional distress, reputational harm, loss of business and personal relationships, other non-economic and economic damages resulting from Defendants' creation of an environment in which Plaintiffs could not bring their champion Highland cattle to AHCA shows due to fear of what they might next be falsely accused of, and resulting from ostracism, including but not limited to loss of sales and marketing opportunities derived from attending AHCA

shows, and further economic damages including but not limited to attorneys' fees and legal costs, in amounts to be determined at trial.

237. Defendants Jacquelyn Chotkowski, Laura McDowell-May, the AHCA and its officers, directors, and agents, continue to harass Plaintiffs and continue to make concerted efforts to destroy and cause the failure of Plaintiffs' business and the BMC.

238. Defendants' malfeasance is intended for the sake of their own financial gain and their competing Highland cattle farms.

239. The harassment and unlawful attempts to undermine Plaintiffs' business continues to the present.

240. Upon information and belief, AHCA members have been falsely told that Plaintiffs are not ethical breeders, as they were being investigated for multiple ethics violations and members were advised not to purchase Shat Acres animals for that reason.

241. Upon information and belief, rather than exoneration, some AHCA members were led to believe that Plaintiff Steward was receiving a "warning letter" in regards to the complaints alleged against her.

242. Plaintiffs were asked in 2019 to make a presentation to Junior members of the Mid-Atlantic Highland Cattle Regional Association (MAHA) about showing cattle, due to Shat Acres' prestige of being the oldest registered herd of Highland cattle in the United States. However, when Janet contacted the organizer to confirm

details, she was informed that their services were no longer needed, and that someone else would be making the presentation.

243.    Plaintiff Steward subsequently learned that the organizer had been informed by the wife of an AHCA Officer and Governance Committee member that Plaintiff Steward was being investigated for multiple ethics violations relating to shows and should not be allowed to make such presentations to Junior members. The wife of the Officer who informed the organizer that Plaintiff Steward was under ethics investigations became the workshop presenter for the Juniors in her place.

244.    This is particularly troubling and humiliating to Plaintiff Steward, who prior to working full time on the farm, was an educator for thirty years, being named the 2002 Vermont Teacher of the Year and a 2004 American Star of Teaching.

245.    Janet continues to be active with the development of Vermont education standards and teaching graduate level education classes.

246.    Upon information and belief, at a 2019 AHCA show, show officials shared false, and confidential, assertions that Plaintiffs were under investigation for misconduct at AHCA shows.

247.    Upon information and belief, AHCA officials have informed other AHCA members of their desire for Plaintiff and Shat Acres to stop showing their Highland cattle at AHCA point shows due to the quality of their cattle, their consistent winnings, and their success with certain AHCA programs such as beef marketing.

248. An AHCA member approached Plaintiff Shatney in a local Vermont farm supply store, berating Plaintiff Shatney and yelling loudly that she had been told by AHCA officials that Plaintiffs were troublemakers and liars and were causing problems for AHCA.

249. AHCA officials and members have stated that former AHCA Presidents Chotkowski and McDowell-May have been primary instigators in the targeting and harassing of Plaintiffs.

250. As noted *supra*, Defendant Chotkowski was the Associate Editor for 14 years and has been the Editor and Publisher of the *Bagpipe* for many years.

251. Any submissions for the *Bagpipe* are to be sent to the Editor.

252. Shat Acres Cinnamon Raisin was the most winning Highland cow in the United States with over a dozen Grand Championships and several Supreme Champions of Shows.

253. Shat Acres Cinnamon Raisin had ten offspring, each offspring a Grand Champion, save her last calf that was never shown due to the targeting and harassment of Plaintiffs by Defendants.

254. In 2018 Shat Acres Cinnamon Raisin, at the comparatively young age of thirteen, developed arthritis in her hip.

255. In the summer of 2018 Plaintiff Steward wrote and submitted an essay about the impending loss of Shat Acres Cinnamon Raisin, both for Plaintiffs and the Highland world.

256.    Plaintiff received an email from Chotkowski stating the *Bagpipe* did not publish stories about individual animals.

257.    Notwithstanding such a statement, the following issue of the *Bagpipe* contained a two-page spread about an individual Highland bull.

258.    This bull had won less Grand Championships than Shat Acres Cinnamon Raisin, and no Supreme Championships of Show.

259.    In 2018, the published bull had no registered offspring.

260.    The bull's owner had previously purchased Highland cattle owned by Defendant Chotkowski.

### AHCA'S INVESTIGATIONS OF OTHER MEMBERS

261.    In contrast to Defendants' actions toward Plaintiffs, complaints leveled against persons who were not viewed as a threat to Defendants Chotkowski and McDonnell-May were treated vastly different.

262.    Upon information and belief, at the 2019 NWSS, an AHCA officer was witnessed extremely intoxicated by Board and other members on the night of the banquet and had difficulty delivering his prepared remarks due to slurred speech.

263.    Upon information and belief, said officer was also witnessed by Board and other members supplying alcohol to minors in the bar area of the hotel and behaving inappropriately into the early hours of the morning with junior members of the AHCA in his hotel room.

264.     Upon information and belief, Defendant Chotkowski was aware and witnessed the inappropriate behavior.

265.     Upon information and belief, many AHCA members as well as Board members made complaints to the Ethics Committee regarding said AHCA officer and his inappropriate conduct.

266.     Members largely received no response to their complaints of said officer's conduct.  Instead, a sham and fraudulent investigation was documented while Board and other members who had made the complaints were harassed, told it was none of their business and that they needed to apologize to said officer because if what occurred "got out" it could cause problems for him and his family.

267.     In a striking contrast, while Plaintiffs had been prohibited from ever receiving or reviewing a copy of the complaints allegedly made against them, said AHCA officer was immediately provided a copy of a signed complaint made against him.

268.     Said officer then provided a response to the complaint after being allowed to review the complaint itself, including the identity of the complainant.

269.     Upon information and belief, additional complaints were made against him, including one by a member of the Board of Directors relating to his behavior in the hotel at the 2019 NWSS, and this complaint was forwarded to the accused along with photographic and/or video evidence.

270.     Said officer was permitted to respond to the complaints in turn.

271.     Those who complained against the officer were told that they needed to apologize to him, and threats that the accusers "needed to be dealt with" were made.

272.     The Ethics Committee conducted a cursory, sham investigation lasting merely a few weeks and submitted the officer's responses to the Board of Directors without any reply gathered from the complainants or interviews performed of corroborating witnesses.

273.     In shocking contrast to the treatment of Plaintiffs, despite the serious allegations made against said officer, the Ethics Committee issued a recommendation that the allegations were unsubstantiated less than two months after the complaints were first made.

274.     Even complaints made against non-members of AHCA are treated with significantly less rigor by Defendants when the individual alleged to have committed the violations is protected by influential members of the Association.

275.     At the 2019 NWSS, the above-mentioned groomer who has been employed to prepare cattle owned by Chotkowski and McDowell-May, was observed and recorded repeatedly striking a junior exhibitor's animal in the same class in which she was showing an animal.

276.     Multiple ethics complaints were lodged by spectators present at the NWSS as well as those witnessing the live broadcast against the groomer who

Defendants Chotkowski and McDowell-May hired, complaining of her abuse of a fellow breeder's animal.

277. Some complainants received no response to their complaints.

278. Instead, the AHCA Show Committee justified the violation of the IAFE Rules by citing an unrelated document created by an unaffiliated entity regarding show etiquette.

279. Even so, the actions of the Defendants' hired groomer violated the show etiquette standards cited in the unrelated document as well.

280. Defendants went so far as to inform some complainants that they must apologize to Defendants' groomer for complaining about her conduct and damaging her reputation.

281. Upon information and belief, threats of legal action against the AHCA were made if the groomer's conduct resulted in any ethics investigations.

282. Upon information and belief, Defendants as individuals and using their authority within the AHCA intimidated and retaliated against the family of the junior exhibitor whose animal was struck by Defendants' hired groomer.

## IMPACT ON PLAINTIFFS OF DEFENDANTS' ACTIONS

283. Defendants' targeting and harassment of Plaintiffs for alleged ethics violations was frivolous, capricious and designed to incur sanctions against or removal of Plaintiffs from the AHCA.

284. Defendants' actions were intended to, and did, cause pain and suffering and humiliation for Plaintiffs as well as encourage other AHCA members to sever personal and professional relationships with Plaintiffs.

285. Defendants' actions were intended with the express purpose of causing other AHCA members to question the professionalism of Plaintiffs, to prevent Plaintiffs from attending and winning AHCA point shows, and to decrease sales of Shat Acres breeding products and stock. These results were achieved.

286. Due to the actions of the Defendants, Plaintiffs have been significantly and substantially damaged.

287. The conspiracy perpetuated by certain members of AHCA, endorsed and perpetuated by AHCA itself through the false ethical investigations, had the intent of damaging Plaintiffs' business in an attempt to force them into compliance with those members' interests or to force them to cease to be members of AHCA.

288. Due to the repeated false claims of ethical violations, Plaintiffs' standing and reputation, which had been built for decades, has been significantly tarnished. Plaintiffs have lost cattle sales due to other breeders' believing, based on Defendants' false claims, that Plaintiffs are unethical breeders.

289. Plaintiffs have not attended livestock shows due to the harassment and humiliation, and for fear of that other false accusations might be made.

290.   The inability of Plaintiffs to attend these shows has resulted in the inability to accumulate awards for their breeding stock and has also directly resulted in lost sales, which are often made at such shows.

291.   In addition, Plaintiffs have suffered severe emotional damages as a result of the continued campaign of harassment.

## STATEMENT OF CLAIMS

### CLAIM ONE: BREACH OF CONTRACT
### Against all Defendants

292.   Plaintiffs incorporate herein each of the above allegations.

293.   Plaintiffs entered into a contract with AHCA for the purchase of a membership in AHCA, which was to provide them with representation of their interests and the promotion of their business, and the interests of the Highland cattle breed at large.

294.   Plaintiffs paid for their membership in AHCA but AHCA, through certain members and officers, sought instead to promote the interest of some members over Plaintiffs and devalue Plaintiffs' business.

295.   Plaintiffs were directly and proximately damaged by Defendants' actions.

296.   Defendants and each of them, as members of the AHCA, agreed that members of the AHCA, including Plaintiffs, would be treated fairly, equally, and in accordance with the AHCA Bylaws, Rules and Regulations, governing documents and operating procedures.

297.   Defendants breached their agreements with Plaintiffs.

298.   Upon information and belief, Defendants' breaches of these contracts were willful and wanton.

299.   Plaintiffs performed all their obligations under the contracts with Defendants.

300.   Plaintiffs were directly and proximately damaged by Defendants' actions.

## CLAIM TWO: BREACH OF COVENANT
## OF GOOD FAITH AND FAIR DEALING
### Against all Defendants

301.    Plaintiffs incorporate herein each of the above allegations.

302.   Plaintiffs' paid membership in AHCA and their reliance on the published Rules and Regulations, Bylaws, governing documents, norms of due process and AHCA's stated mission and purpose, created an implied covenant that AHCA would operate toward Plaintiffs in good faith.

303.   Defendants and each of them, as members of the AHCA, acted in violation of their agreements under the AHCA governing documents by taking actions that were unfair, unreasonable, violated norms of due process, good faith and fair dealing.

304.   Defendants' actions, and the actions of its members, officers, directors, agents and employees reduced the value of Plaintiffs' membership and substantially reduced the value of Plaintiffs' livestock and business.

305.   Defendants' actions, and the actions of its members, officers, agents, employees and directors, directly violated the purpose of Plaintiffs' membership and violated the implied covenant of good faith and fair dealing.

306.    Plaintiffs were substantially damaged by as a direct result of Defendants' breaches of the covenant of good faith and fair dealing.

## CLAIM THREE: PROMISSORY ESTOPPEL
## Against all Defendants

307.    Plaintiffs incorporate herein each of the above allegations.

308.    Defendants and each of them, as members, directors and officers of the AHCA, made promises to Plaintiffs regarding Plaintiffs' investments in the AHCA.

309.    Defendants promised that Plaintiffs would be treated fairly, similar to other AHCA members, and afforded due process in their dealings within the organization.

310.    Defendants should reasonably have expected that these promises would induce action or forbearance by Plaintiffs.

311.    Defendants made the following promises to Plaintiffs:

a.    Defendants promised adherence to AHCA rules and regulations when conducting the above-described ethics investigations of Plaintiffs.

b.    AHCA bylaws, rules and regulations, governing documents and norms of due process and confidentiality provide procedures for conducting such investigations.

312.    Defendants failed to proceed according to said promises.

313.    The promises must be enforced to prevent injustice.

## CLAIM FOUR: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against Jacquelyn Chotkowski, Laura McDowell-May

314.   Plaintiffs incorporate herein each of the above allegations.

315.   Defendants engaged in extreme and outrageous conduct.

316.   Defendants engaged in such conduct recklessly or with the intent of causing the Plaintiffs severe emotional distress.

317.   Defendants' conduct caused the Plaintiffs to suffer severe emotional distress.

## CLAIM FIVE: TORTIOUS INTERFERENCE
### Against all Defendants

318.   Defendants and each of them knew or should have known that their actions would cause others with whom Plaintiffs had contracts or business dealings to abandon those contracts or business dealings.

319.   Defendants by words or conduct intentionally caused others to abandon those contracts or business dealings.

320.   Interference with said contracts or business dealings by Defendants was improper.

321.   Defendants' interference with these contracts was also willful and wanton, done heedlessly and recklessly, without regard to the consequences and without regard to the rights of the Plaintiffs.

322.   In particular, Defendants' actions falsely accusing Plaintiffs of ethical misconduct, and/or leaking confidential information regarding AHCA

investigations of Plaintiffs' alleged ethical misconduct, was intended (or recklessly done) to result in Plaintiffs' losing business dealings and contracts.

323.   Defendants' actions have caused and will cause Plaintiffs damage including but not limited to loss of income.

324.   Defendants' actions were intended not only to cause Plaintiffs to lose contracts, but to result in an increase of business.

## <u>CLAIM SIX: DEFAMATION PER SE</u><br><u>Against AHCA, Chotkowski, McDowell-May</u>

325.   Plaintiffs incorporate herein each of the above allegations.

326.   Defendants made false and defamatory statements about Plaintiffs to third parties in both spoken and written forms that were communicated and published to others.

327.   Defendant Jacquelyn Chotkowski repeatedly, and falsely, told AHCA members, agents, employees, directors and officers that Plaintiff was lying during her beef marketing reports. Members of the AHCA present during these attacks were aware of these false accusations.

328.   Defendants falsely accused Plaintiff Shatney of being a troublemaker and maligned his reputation in the AHCA.

329.   Defendants falsely accused Plaintiff Steward of being a liar and maligned her reputation in the AHCA.

330.    Defendants made public and groundless threats of legal action including criminal charges against Plaintiffs in the manner in which they conducted their profession, further maligning their reputations.

331.    Defendants made false and defamatory allegations to ACHA ethics committee members claiming that they received complaints of unethical behavior by Plaintiffs, and thereby sparking "ethics investigations" of Plaintiffs that caused reputational damages to Plaintiffs.

332.    Defendants then leaked word of these spurious "ethics investigations" to further damage Plaintiffs' reputation.

333.    Plaintiffs' reputations among AHCA members and others in the cattle community was in fact damaged.

334.    Defendants' false and derogatory statements about Plaintiffs resulted in monetary losses, pain and suffering, emotional distress and impairment of Plaintiffs' reputations.

335.    Plaintiffs were directly and proximately damaged by Defendants' actions.

### CLAIM SEVEN: TRADE LIBEL
### Against all Defendants

336.    Plaintiffs incorporate herein each of the above allegations.

337.    Defendants made false and defamatory statements about Plaintiffs to third parties in both spoken and written forms that were communicated and published to others.

338.   Defendant Jacquelyn Chotkowski repeatedly, and falsely, told AHCA members, agents, employees, directors and officers that Plaintiff Steward was lying during her beef marketing reports. Members of the AHCA present during these attacks were aware of these false accusations.

339.   Defendants falsely accused Plaintiff Shatney of being a troublemaker and maligned his reputation in the AHCA.

340.   Defendants falsely accused Plaintiff Steward of being a liar and maligned her reputation in the AHCA.

341.   Defendants made unsubstantiated threats of legal action including criminal charges against Plaintiffs, further maligning their reputations.

342.   Defendants made false and defamatory allegations to ACHA ethics committee members claiming that they received complaints of unethical behavior by Plaintiffs, and thereby sparking "ethics investigations" of Plaintiffs that caused reputational damages to Plaintiffs.

343.   Defendants then leaked word of these spurious "ethics investigations" to further damage Plaintiffs' reputation.

344.   Plaintiffs' reputations among AHCA members and others in the cattle community was in fact damaged.

345.   Defendants' false and derogatory statements about Plaintiffs resulted in monetary losses, pain and suffering, emotional distress and impairment of Plaintiffs' reputations.

346.   Plaintiffs were directly and proximately damaged by Defendants' actions.

## CLAIM EIGHT: VIOLATIONS OF THE SHERMAN ANTITRUST ACT
### Against all Defendants

347.   Plaintiffs incorporate herein each of the above allegations.

348.   Defendants' above-described actions constitute concerted actions and/or conspiracy among two or more separate entities.

349.   The above-described actions of Defendants constitute unreasonable restraints on trade which affect interstate commerce.

350.   Defendants have the power to raise its prices on goods by limiting the amount of goods produced.

351.   Plaintiffs' have been significantly damaged by Defendants' anti-competitive actions.

352.   Defendants' actions violate 15 U.S.C. § 1 and Plaintiffs' claims arise under 15 U.S.C. § 15 and 22.

## CLAIM NINE: VIOLATION OF THE VERMONT CONSUMER PROTECTION ACT
### Against all Defendants

353.   Plaintiffs incorporate herein each of the above allegations.

354.   Defendants' actions, and those of its officers and members, constitute unfair or deceptive trade practices in commerce.

355.   Plaintiffs purchased a membership in reliance upon the stated purpose and mission of AHCA.

356. Plaintiffs were damaged as a direct and proximate result of Defendants' actions.

357. Defendants' actions violate 9 V.S.A. § 2453 and Plaintiffs' claims arise under 9 V.S.A. § 2461 and 2465.

**WHEREFORE**, Plaintiffs pray this Court enter Judgment for Plaintiffs and against Defendants and each of them:

    a) For compensatory damages of economic and non-economic damages suffered by Plaintiffs as a result of Defendants' actions;

    b) For pre-judgment and post-judgment interest;

    c) For statutory penalties pursuant to statute;

    d) For legal costs pursuant C.R.C.P. 54(d);

    e) For attorney's fees pursuant to statute and law;

    f) For injunctive relief to put an end to ongoing harassment, targeting, defamation, undue process, anti-competitive behavior by Defendants and to mandate Defendants issue a public apology to Plaintiffs;

    g) For an order to disgorge any and all profits resulting from Defendants' unjust actions to increase their own business at the expense of Plaintiffs;

    h) and for such other relief as is just and equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED THIS 17th DAY OF MAY, 2021.

*s/ Dan Ernst*
Jereme L. Baker, Atty Reg. No. 41515
Dan Ernst, Atty Reg. No. 53438
Baker Law Group, LLC
8301 E. Prentice Ave, Suite 405
Denver, CO 80111
Telephone: (303) 862-4564
E-mail: jereme@bakerlawgroup.com;
   dan@bakerlawgroup.com
*Attorneys for Plaintiffs*

*s/ Robin Freeman*
Robin A. Freeman, Jr., Esq. (*pro hac vice*)
Earle & Freeman, PLC
P.O. Box 1385
107 State Street
Montpelier, VT 05601-1385
Telephone: (802) 225-6495
Email: raf@earlefreemanlaw.com
*Attorney for Plaintiffs*