## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 21-cv-1348-WJM-TPO

SHAT ACRES HIGHLAND CATTLE, LLC, a Vermont limited liability company,
JANET STEWARD, an individual, and
RAY SHATNEY, an individual,

      Plaintiffs,

v.

AMERICAN HIGHLAND CATTLE ASSOCIATION (AHCA), a South Dakota nonprofit
corporation with its principal place of business in Brighton, Colorado,
JAQUELYN CHOTKOWSKI, individually and as a member of AHCA,
LAURA MCDOWELL-MAY, individually and as a member of AHCA,
SPRING FLIGHT FARM LLC, a New York limited liability company, and
SEAWIND MEADOWS LLC, a Massachusetts limited liability company,

      Defendants.

---

### ORDER GRANTING IN PART AND DENYING IN PART
### DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

---

Before the Court is Defendants' American Highland Cattle Association ("AHCA"),

Jacquelyn Chotkowski, Laura McDowell-May (jointly, "Individual Defendants"), Spring

Flight Farm, LLC ("Spring Flight"), and Seawind Meadows, LLC ("Seawind") (jointly,

"Entity Defendants") (collectively, "Defendants") Motion to Dismiss ("Motion") the First

Amended Complaint ("FAC").  (ECF No. 117.)

For the following reasons, the Motion is granted in part and denied in part.

### I. GENERAL BACKGROUND[1]

Janet Seward and Ray Shatney own and operate Shat Acres Highland Cattle,

---

[1] Because the FAC does not differ from the original in most respects, the Court

LLC ("Shat Acres") (collectively, "Plaintiffs"). (¶¶ 15–16.) Plaintiffs are citizens of

Vermont. (*Id.*) Chotkowski owns Spring Farm, and both are citizens of New York.

(¶¶ 11–12.) McDowell-May owns Seawind, and both are citizens of Massachusetts.

(¶¶ 13–14.) Plaintiffs, the Individual Defendants, and the Entity Defendants are all

members of the AHCA, which is a citizen of South Dakota and Colorado. (¶¶ 6–7.)

Plaintiffs, the Individual Defendants, and the Entity Defendants are each highly involved

in the AHCA, with Chotkowksi and McDowell-May both being past presidents. (*E.g.*, ¶¶

11–14, 37, 42, 53.)

The AHCA is a trade organization with the stated purpose of preserving the

integrity of the Highland cattle breed and assisting members in creating and maintaining

the value of their stock. (¶ 49.) It maintains a registry of Highland cattle, only available

to dues-paying members, which catalogues the registered cattle's pedigrees. (¶ 55.)

Because registration ensures an animal's pedigree, an animal that is not registered has

substantially less value than one that is. (¶ 56.) The AHCA also organizes cattle shows

and sponsors the National Western Stock Show ("Stock Show") in Denver, Colorado,

which is the largest Highland cattle show in the United States. (¶¶ 57–58, 61; ECF No.

90 at 2.) An animal's success at such a show dramatically increases its breeding and

resale value. (¶ 59.) Plaintiffs' cattle have been extraordinarily successful at these

shows. (¶¶ 61–64, 68–71.)

Chotkowski is highly influential with the AHCA. (¶¶ 96–99.) "It is widely believed

among AHCA members that, despite who may be serving as an officer or Board

---

continues to cite to the original complaint to set forth the general background. Citations to (¶
__), without more, are references to the original complaint. (ECF No. 1.). The Court assumes
these facts as true only for the purposes of this Order.

member, Defendant Jacquelyn Chotkowski, and those allied with her, control the

Association and all aspects of it." (¶ 99.) To put it succinctly, Plaintiffs have some

fundamental differences of opinion with the Individual Defendants about how to show

and preserve the Highland breed and how to ensure such preservation is financially

feasible. (¶¶ 101–33.)

In 2015, as a result of these fundamental differences and work Steward

performed as part of an AHCA committee to advance her vision on these issues,

Chatkowski, McDowell-May and non-party Deb Nelson allegedly engaged in a

campaign of false allegations of ethical violations and threats to bring unspecified

criminal charges against Plaintiffs. (¶¶ 134–72.) This campaign resulted in an

investigation of Plaintiffs by an AHCA Ethics Committee. (¶¶ 155–56.) The Ethics

Committee exonerated Plaintiffs of any wrongdoing and ordered Chotkowski to issue a

written apology. (¶ 162.) Chotkowski did not comply with this order but, even after

being notified of this failure, the AHCA board refused to punish Chotkowski. (¶¶ 163–

65.) According to Plaintiffs, this emboldened Chotkowski, and she and McDowell-May

continued their attempts to undermine Steward's efforts. (¶ 166.)

In 2018, after Plaintiffs' incredibly successful year in 2017, a similar series of

events unfolded. (¶ 174.) Plaintiffs were informed that more complaints had been

made against them and that, despite no board authorization of an Ethics Committee, an

investigation was being conducted into their alleged conduct. (¶¶ 178–86.) Plaintiffs

learned that some of the allegations were allegedly the result of McDowell-May's lie to

the AHCA Governance Committee that she had received complaints about Steward.

(¶¶ 177–81.) This meeting was held in Denver, Colorado and was attended by both

Chotkowski and McDowell-May.  (ECF No. 91-1 ¶¶ 2–3.)  Other allegations pertained to
Plaintiffs' conduct at AHCA shows in violation of the International Association of Fairs
and Exhibitions Code of Show Ring Ethics ("IAFE Code").  (¶ 188.)  Rather than
definitively declaring that these accusations were false, the AHCA determined that it
could not investigate these allegations because the underlying conduct occurred before
it adopted the IAFE Code.  (¶¶ 195–96.)  According to Plaintiffs, this was misleading
because AHCA "point shows" and NWSS have operated under the IAFE Code for
decades.  (¶¶ 190–93.)  Ultimately, Plaintiffs were again exonerated of wrongdoing.
(¶ 226.)  Despite this, the reputational damage had allegedly been done, resulting in a
30% reduction in Plaintiffs' breeding sales in 2018 and no AHCA member buying any
cattle from them in either 2018 or 2019.  (¶¶ 232–33.)

## II. PROCEDURAL HISTORY

On May 17, 2021, Plaintiffs sued Defendants, alleging nine claims: (1) breach of
contract; (2) breach of covenant of good faith and fair dealing; (3) promissory estoppel
(collectively, "contract claims"); (4) intentional infliction of emotional distress; (5) tortious
interference; (6) defamation *per se*; (7) trade libel (collectively, "tort claims"); (8)
violation of the Sherman Antitrust Act ("SAA"); and (9) violation of the Vermont
Consumer Protection Act ("VCPA").  (*See generally* ECF No. 1.)  In October 2022,
Defendants moved to dismiss the claims under various theories.  (*See generally* ECF
No. 90.)

In October 2023, the Court granted in part and denied in part Defendants' Motion
to Dismiss.  (ECF No. 96.)  After finding that it had personal jurisdiction over
Defendants, the Court turned to whether Plaintiffs stated a SAA claim.  (*Id.* at 16.)  The

Court found that Plaintiffs did not state a claim under the SAA because they did not sufficiently allege that Defendants had entered into a contract, combination, or conspiracy. (*Id.* at 17 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)).) Specifically, the Court found "that Plaintiffs have failed to allege facts that plausibly suggest (rather than being merely consistent with) a conspiracy." (*Id.* at 18.)

In the Court's view, it was clear "that the Individual Defendants had a dispute with Plaintiffs, and Plaintiffs clearly allege that the Individual Defendants used their positions of power to injure Plaintiffs' standing within the AHCA." (*Id.*) But it was not clear to the Court that Plaintiffs alleged facts "rul[ing] out the entirely consistent possibility that the Defendants acted independently of one another because they simply disliked Plaintiffs." (*Id.* at 18–19.) Indeed, the Court observed, Plaintiff alleged a conspiracy based primarily on events that occurred in 2015, which may have been outside the statute of limitations. (*Id.* at 17–18.) Accordingly, the Court dismissed the SAA claim without prejudice, allowing Plaintiffs to file an amended complaint "alleg[ing] facts that do tend to rule out mere parallel conduct." (*Id.* at 20.) And because the Court dismissed the SAA claim—the basis of the Court's federal question subject matter jurisdiction—the Court declined to exercise jurisdiction over or address the remaining state law claims arising from the same set of operative facts. (*Id.*)

In December 2023, Plaintiffs filed the FAC, which is identical to the original complaint except that it asserts (1) that jurisdiction is proper under both diversity and federal question jurisdiction, and (2) more detailed allegations of Defendants' conduct from 2018 in support of the SAA claim. (ECF No. 104 at 4–8; *id.* at 62–66.) In February 2024, Defendants filed the Motion, which is fully briefed. (ECF Nos. 117, 123, 129.)

### III. LEGAL STANDARDS

Under Rule 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotation marks omitted).

The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). Thus, in ruling on a motion to dismiss under Rule 12(b)(6), the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Still, "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "[C]omplaints that are

no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' . . . 'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## IV. ANALYSIS

Defendants move to dismiss[2] the numerous claims in the FAC under various theories, including that the claims fail to state a claim and are time-barred. (*See* ECF No. 117 at 5–18.) Addressing each claim in turn, the Court grants the Motion with respect to the state law claims but denies the Motion with respect to the federal law claim.

### 1.    SAA Claim

Defendants contend, in cursory fashion,[3] that "Plaintiffs do not plead allegations that an agreement occurred between all Defendants, that all Defendants were competitors with one another, or that an agreement, if any, was for an unlawful purpose to prohibit trade or commerce." (*Id.* at 6.) Like in their first motion to dismiss, Defendants focus on the alleged absence of an unlawful agreement, arguing that, "[a]t most, Plaintiffs allege the possibility of parallel conduct." (*Id.*) The Court disagrees.

---

[2] The Court observes that Defendants repeatedly point out that the FAC "merely states legal conclusions" for Plaintiffs' numerous claims and fails to satisfy F.R.C.P. 8 and 9. (*See, e.g.*, ECF No. 117 at 17.) The Court finds that the FAC is largely styled as a "shotgun pleading"—"that is, the recitation of an extended factual narrative followed by pleading numerous claims without adequately specifying which facts apply to which claims and which parties." *Fawley v. Lucero*, 2023 WL 2487323, at * 2 (10th Cir. Mar. 14, 2023). Still, while the Court finds the FAC difficult to follow as a result, Plaintiffs' response to the Motion at least cites the specific portions of the FAC on which it bases its claims. Thus, the Court declines to dismiss the FAC on this basis. *See Haynes v. Allstate Fire & Cas. Ins.*, 2020 WL 816043, at *7 (D. Colo. Feb. 18, 2020) ("This Court does not find such a technical violation to warrant striking a Complaint where, despite the overbroad incorporation of preceding allegations, the defendant is provided fair notice of the factual and legal basis for each claim.").

[3] Defendants' argument in the Motion as to the SAA claim is less than a page long, with only two sentences of analysis. (ECF No. 117 at 6.) Given this state of the Motion, the Court addresses only whether Plaintiffs sufficiently allege an unlawful agreement.

As discussed in the Court's earlier Order, to plausibly allege a SAA claim, Plaintiffs must plead the following elements: (1) Defendants entered into a contract, combination, or conspiracy; (2) the contract, combination, or conspiracy unreasonably restrained trade in the relevant market; and (3) that this restraint injured their property or business.  (ECF No. 96 at 17 (citing *Twombly*, 550 U.S. at 553).)  "[T]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."  *Twombly*, 550 U.S. at 553 (cleaned up).  At the pleading stage, a plausible claim "requires . . . enough factual matter (taken as true) to suggest that an agreement was made . . . [and] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Id*. at 556.

A plaintiff can show an unlawful agreement through direct or circumstantial evidence.  *See Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1083–85 (10th Cir. 2006).  Direct evidence is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *Id*. at 1083 (quotation omitted); *see also Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1174 n.24 (10th Cir. 2019) ("Direct evidence of a § 1 agreement may take the form of a written contract or agreement, such as association rules, or admissions of an agreement.").  But, because "[t]he absence of direct evidence is common in antitrust claims, especially at the motion-to-dismiss stage, . . . claims can [also] survive solely on circumstantial evidence," *Othart Dairy Farms, LLC v. Dairy Farmers of Am., Inc.*, 2024 WL 1051322, at *12 (D.N.M. Mar. 11, 2024)—that is, evidence that "require[s] inferences to show that an anti-competitive agreement exists."  *Llacua*, 930 F.3d at 1174 n.24.

Plaintiffs do not present direct evidence of an agreement, so the Court focuses

on circumstantial evidence. "If the complaint . . . makes only 'allegations of parallel conduct . . . in order to make a § 1 claim, [such allegations] must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'" *Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 80 F. Supp. 3d 1257, 1263 (D. Colo. 2015) (quoting *Twombly*, 550 U.S. at 557 (alterations in original)). "For a § 1 claim to survive, then, a plaintiff must plead parallel conduct and something 'more,'" *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015) (quoting Twombly, 550 U.S. at 557), *i.e.*, "plus factors," *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013).

"Plus factors" are "economic actions and outcomes that are largely inconsistent with unilateral, lawful conduct but largely consistent with explicitly coordinated action.'" *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 915 (N.D. Cal. 2019) (quoting *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015)). Plus factors include allegations (1) about the defendants' motives to enter into an unlawful agreement; (2) that the defendants acted contrary to their interests; (3) "implying a traditional conspiracy," *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 227 (3d Cir. 2011), or (4) of "a high level of interfirm communications," *Mayor of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). These factors are "neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016); *see also In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1371 (N.D. Ga. 2017) ("There is no finite list

of plus factors.").

The Court has already found in its first motion to dismiss order that the original complaint sufficiently alleged parallel conduct by showing that Defendants acted similarly.  *SD3, LLC*, 801 F.3d at 427 ("A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'").  Defendants do not appear to contest this point.  (*See* ECF No. 117 at 6.)

The Court now finds, in addition, that the FAC also alleges conduct largely consistent with explicit coordinated action.  In particular, the FAC alleges:

- In 2018, Chotkowski and McDowell-May "worked together to file the [ethics] complaint with AHCA," along with Ginna Moses, AHCA's Operations Manager.  (ECF No. 104 at 62.)

- In 2017, after Plaintiffs' cattle won grand prizes in two competitions Defendants' cattle also participated in, Moses sent Plaintiffs a letter on May 23, 2018, "stating that Plaintiffs had been accused of the three fabricated ethics violations."  (*Id.* at 64.)

- On May 15,[4] 2018—about a week before Moses sent the May 23, 2018 letter—only the Individual Defendants, Moses, and a person[5] named Dwight Eisenhauer attended an AHCA Governance Committee meeting where these individuals acknowledged "receiv[ing] five complaints against

---

[4] Plaintiffs refer to a May 5, 2018 meeting in the same paragraph in which they refer to the May 15, 2018 meeting.  Based on the relevant context, the Court assumes Plaintiffs intended to refer only to the meeting that occurred on May 15, 2018.

[5] It is not clear to the Court who this person is, but the relevant context suggests he is an AHCA member.

an AHCA member." According to Eisenhauer, other AHCA members stopped attending the Governance Committee meetings "because most members wanted no part of what was being conspired to amongst Chotkowski, McDowell-May, and Moses against Plaintiffs." (*Id.*)

- On June 22, 2018, "the Governance Committee reported that they forwarded three ethics complaints against Plaintiffs to the ethics committee." Eisenhauer told Plaintiffs to listen to the recording of the meeting, "as it reveals that Chotkowski and McDowell-May were working together to improperly target Plaintiffs," and that Moses was helping the Individual Defendants "to conceal from [Eisenhauer] what they were doing with respect to the 'ethics complaints.'" Moses "intentionally cover[ed] up the concert of action against Plaintiffs by writing 'Robust Discussion Followed' in the minutes rather than detailing what was discussed about said 'ethics complaints.'" (*Id.* at 65.)

- AHCA "has refused to provide the recording" or "any copies of the complaints or the identity of the complainants," indicating that AHCA "has participated and furthered the actions taken against Plaintiffs by participating in the effort to cover-up the tortious actions against Plaintiffs." (*Id.* at 65–66.)

- Several AHCA members told Plaintiffs they had heard that Plaintiffs "were unethical," which suggests that the ethics complaints, "which were supposed to be confidential, could only have become public knowledge by being by leaked by someone on the AHCA Board or its respective

Committees, which is further indication of a concerted effort by

Defendants to continue ruining Plaintiffs' reputations even after the

groundless ethics complaints did not work to disqualify them." (*Id.* at 66.)

In the Court's view, these allegations correspond with at least two plus factors

"tending to exclude the possibility of independent actions." *United Am. Corp. v. Bitmain,*

*Inc.*, 530 F. Supp. 3d 1241, 1259–60 (S.D. Fla. 2021). First, the allegations suggest

that Defendants were motivated to work together to damage Plaintiffs' reputation,

thereby suppressing competition and increasing their likelihood of receiving greater

profits, because Plaintiff had beaten the Individual Defendants and Entity Defendants in

two competitions shortly before receiving the May 15, 2018 letter. *See Anderson News,*

*L.L.C. v. Am. Media, Inc.*, 123 F. Supp. 3d 478, 500 (S.D.N.Y. 2015) ("Motive to

conspire may be inferred where the parallel 'action taken [by defendants] had the effect

of creating a likelihood of increased profits.'" (quoting *First Nat'l Bank of Ariz. v. Cities*

*Serv. Co.*, 391 U.S. 253, 287 (1968))), *aff'd*, 899 F.3d 87 (2d Cir. 2018).

Second, the allegations also suggest "a high level of interfirm communications,"

as the Defendants attended exclusive meetings at which they discussed the ethics

complaints and attempted to cover their tracks. *Iowa Pub. Emps. Ret. Sys. v. Merrill*

*Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 322 (S.D.N.Y. 2018)

(confirming that interfirm communications "need not necessarily be conspiratorial

communication" to be a relevant consideration); *In re Delta/AirTran Baggage Fee*

*Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010) ("Courts have . . . found

that unlawful conspiracies may be inferred when collusive communications among

competitors precede changed/responsive business practices, such as new pricing

practices . . . .").  Importantly, Plaintiffs allege that the Individual Defendants and Entity

Defendants received help from Moses, AHCA's Operations Manager, to further this

unlawful campaign.

Thus, taken together, the Court concludes that Plaintiffs have adequately alleged

sufficient "plus factors" to avoid dismissal at the pleading stage.  *Brown*, 2023 WL

6294161, at *12 (concluding that pleading "at least two plus factors" permitted a plaintiff

to survive a motion to dismiss); *Crownalytics, LLC v. SPINS LLC*, 2024 WL 2111570, at

*7 (D. Colo. May 10, 2024) (denying motion to dismiss based on failure to allege an

unlawful agreement).

Defendants do not reference any plus factors, let alone dispute their application

to the FAC's alleged facts.  Instead, in their Reply, Defendants simply repeat that the

FAC fails to state the elements of a SAA claim.  (ECF No. 129 at 3.)  They do not

develop their argument that "Plaintiffs do not sufficiently allege that Defendants are

competitors with an illegal agreement to restrain trade or commerce."  (*Id.*)  Separately,

Defendants argue—for the first time—that Plaintiffs do not allege that they are

competitors with the AHCA or that the Defendants' alleged misconduct harmed the

market and consumers in general.  (*Id.* at 3–4.)  The Court does not consider these

belated arguments, however, because they were first raised in a reply brief and thus

gave Plaintiffs no opportunity to respond to them.  *See Novosteel Sa v. United States*,

284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Reply briefs *reply* to arguments made in the

response brief—they do not provide the moving party a new opportunity to present yet

another issue for the court's consideration."); *cf. Gates Corp. v. Dorman Prod., Inc.*,

2009 WL 4675099, at *2 (D. Colo. Dec. 7, 2009) (addressing arguments made for the

first time in a reply brief but that directly rebutted Plaintiff's response brief contentions). Defendants are free to reraise these arguments at a later stage of this case.

Lastly, the Court rejects Defendants' argument that the SAA claim is time-barred by 15 U.S.C. § 15(b)'s four-year statute of limitations.  As discussed, Plaintiffs allege anticompetitive conduct by Defendants that occurred as recent as May 23, 2018, or about three years before Plaintiffs filed this action on May 17, 2021.  (*See* ECF No. 1.) The Court reiterates that, while Plaintiffs may not base their SAA claim on events that allegedly occurred before May 17, 2017—including the events from 2015—they may present evidence of such events for the narrow purpose of providing background and context to their claims.  (*See* ECF No. 96 at 18 ("The Court first notes that it does not agree with Defendants that the actions taking place in 2015 are irrelevant simply because any cause of action they may have given rise to is time-barred.").)

For all these reasons, Plaintiff's SAA claim may proceed.

### 2.    State Law Claims[6]

Defendants move to dismiss Plaintiffs' eight state law claims based on three theories: (1) "the contractual obligations of the forum selection clause"; (2) Colorado's applicable statutes of limitations; and (3) failure to state a claim under Rule 12(b)(6). (ECF No. 117 at 6, 9, 11.)  The Court agrees that Plaintiffs' state law claims must be dismissed.

### A.  Forum Selection Clause

Initially, the Court addresses Defendants contention that Plaintiffs' eight state law

---

[6] Neither party challenges the Court's earlier finding that it has supplemental jurisdiction over the state law claims "[b]ecause the Plaintiffs' antitrust claim arises from the same set of operative facts as his state-law claims."  (ECF No. 96 at 20.)  The Court therefore does not disturb that ruling.

claims must be dismissed based on the forum selection clause in the AHCA's Rules and

Regulations.  (*Id.* at 8.)  The clause states:

> Any person(s) or business entity joining or renewing
> membership in AHCA shall be deemed to agree to dispute
> resolution in Adams County, Colorado.  By becoming a
> member, said member(s) agrees that any and all disputes by
> and between members of the Association and the American
> Highland Cattle Association shall be first submitted to
> mediation in Adams County, Colorado.  In the event good
> faith efforts to resolve the dispute in mediation fails, the
> parties may resort to litigation in the State Courts of
> Colorado, Adams County, Colorado.

(*Id.*)

Defendants contend that the clause's "plain language provides for venue in the

Colorado State Courts in Adams County, Colorado," and its "use of the word 'county'

and specificity of 'State Courts' establishes the clause is mandatory."  (*Id.*)  Defendants

are mistaken.

A valid forum selection clause may prohibit a federal court from exercising

jurisdiction if the parties contractually agree to litigate matters elsewhere.  M/*S Bremen

v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972); *Riley v. Kingsley Underwriting

Agencies, Ltd.*, 969 F.2d 953, 957 (10th Cir. 1992).  Forum selection clauses are

frequently classified as either mandatory or permissive.  *Excell, Inc. v. Sterling Boiler &

Mech., Inc.*, 106 F.3d 318, 321 (10th Cir. 1997) (citations omitted).  "The difference

between a mandatory and permissive forum selection clause is that '[m]andatory forum

selection clauses contain clear language showing that jurisdiction is appropriate only in

the designated forum.'"  *Am. Soda, LLP v. U.S. Filter Wastewater Grp., Inc.*, 428 F.3d

921, 926 (10th Cir.2005).  "In contrast, permissive forum selection clauses authorize

jurisdiction in a designated forum, but do not prohibit litigation elsewhere."  *Id.* at 926–27

(citation omitted).

The Tenth Circuit has held that, when venue is specified in a forum-selection clause, such as when the parties designate a particular county or tribunal, and the designation is accompanied by mandatory or obligatory language, a forum-selection clause will be enforced as mandatory. *See K & V Scientific Co., Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 314 F.3d 494 (10th Cir.2002). For instance, the Circuit has held that a forum-selection clause providing that "venue *shall* be proper under this agreement in Johnson County, Kansas" was mandatory. *Id*. at 498 (emphasis added).

By contrast, the forum selection clause here plainly provides that the parties "may" file suit in Adams County state court if mediation fails. *See Arrow Enter. Computing Sols., Inc. v. Right PriceIT, LLC*, 2023 WL 4178026, at *7 (D. Colo. June 26, 2023) ("Unlike the mandatory nature of the forum selection clause in the Security Agreement, the forum selection clause in the Personal Guaranty is permissive (*i.e.*, '[t]he obligations . . . hereunder *may* be enforced' in a particular court); *see also Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 953 F.3d 660, 674 (10th Cir. 2020) ("[T]he lack of any language suggesting exclusivity confirms that the parties bargained for a permissive, but not mandatory, forum selection clause."). And, significantly, the clause uses the mandatory term, "shall," in the sentence immediately preceding the sentence using the permissive term, "may." Thus, the drafter of the clause clearly knew how to use mandatory language if they wanted to.

Consequently, the Court does not dismiss the state law claims based on the permissive language in the forum selection clause.

### B.  Contract Claims

Nevertheless, Defendants contend that Plaintiffs' contract claims are barred under section 13-80-101(1)(a), C.R.S. (2024), which sets forth a three-year statute of limitations for "cause[s] of action for breach of any express or implied contract."  (ECF No. 117 at 9.)  Defendants further contend that the contract claims fail because "Plaintiffs' allegations of a 'contract' are unclear and do no allege all parties were in a 'contract' with one another."  (*Id.* at 12.)  Defendants add that "Plaintiffs do not provide any wording from a 'contract,' a statement of it, or attach it as an exhibit, so as to meet the *haec verba* requirement."  (*Id.*)

Plaintiffs respond that Vermont law—not Colorado law—governs the contract claims and, accordingly, the claims are subject to Vermont's six-year statute of limitations.  (ECF No. 123 at 10 (citing 12 V.S.A. § 511).)  In any event, Plaintiffs maintain that the contract claims were filed within Colorado's three-year statute of limitations.  (*Id.*)  Plaintiffs further maintain that the FAC sufficiently alleges an implied contract against Defendants.  (*Id.* at 14–15.)

As a threshold matter, the Court concludes that it need not decide whether Colorado law or Vermont law governs the contract claims because, as alleged, Plaintiff's contract claims are timely under both Colorado's and Vermont's statute of limitations—that is, the laws do not conflict.  *Richardson v. Allstate Fire & Cas. Ins. Co.*, 637 F. Supp. 3d 1186, 1190 (D. Colo. 2022) ("Any conflict of laws analysis begins, perforce, with a determination whether a conflict actually exists . . . ."); *Bartelli v. Empower Annuity Ins. Co. of Am.*, 2024 WL 4528146, at *4 (D. Colo. Oct. 18, 2024) ("[A] choice-of-law analysis is only necessary if there is an outcome-determinative

conflict of law.").  Plaintiffs allege "that they first discovered on May 23, 2018, the
conduct for which they brought" the contract claims—specifically, when Steward
"received notice from Defendant AHCA, through its employee Ginnah Moses, that she
was being investigated for ethics complaints lodged against her."  (ECF No. 123 at 11.)
May 23, 2018 is within three years of May 17, 2021, the date on which Plaintiffs filed
this action.  (ECF No. 1.)  Hence, the contract claims are timely under both Vermont's
six-year and Colorado's three-year statutes of limitations, and the Court will therefore
not dismiss the contract claims based on timeliness at the pleading stage.

      The Court agrees with Defendants, however, that Plaintiffs' contract claims fail to
state a claim.  (ECF No. 177 at 12.)  In support of their implied contract theory, Plaintiffs
allege that, "[i]n return for paying membership dues and other fees to AHCA, the
association covenants with its members to represent their interest with respect to
maintaining the value of the Highland breed."  (ECF No. 104 at 13.)  Plaintiffs continue,
"AHCA further covenants with its members to treat all members equally and without
favoring the interests of certain members over others."  (*Id.*)

      The Court finds that these general, aspirational statements are insufficient to
establish the existence of an implied contract.  *See Stice v. Peterson*, 355 P.2d 948,
952 (1960) (an offer must contain terms "sufficiently definite to enable the court to
determine whether the contract has been performed.").  The Tenth Circuit reached the
same conclusion under similar circumstances in *Vasey v. Martin Marietta Corp.*, 29 F.3d
1460 (10th Cir. 1994).  There, the Circuit rejected a plaintiff's claim that he entered into
an implied contract with his employer-defendant who had issued an equal employment
memorandum stating that it "believes in the highest ethical standards" and that it was

"committed to just management and equality for all . . . and respecting the dignity and privacy due all human beings." *Id.* at 1465. The Circuit explained that such statements were "merely 'vague assurances' . . . and too indefinite to constitute a contractual offer which would enable a court to determine whether a contract has been performed." *Id.* Notably, the *Vasey* court favorably cited *Dupree v. United Parcel Service*, 956 F.2d 219, 222 (10th Cir.1992), which held that the statement, "[w]e treat our people fairly and without favoritism," was too vague to create an implied contract under Oklahoma law. The Court sees little daylight between the vague assurances rejected by the *Dupree* and *Vasey* courts and the one relied on by Plaintiffs here. *See Dupree*, 956 F.2d at 222 (concluding that, while the existence of an implied contract is normally a factual inquiry for the jury, the issue may be decided as a matter of law if the alleged promises are nothing more than "vague assurances.").

Plaintiffs' reliance on *Tuttle v. ANR Freight System, Inc.*, 797 P.2d 825 (Colo. App. 1990), does not convince the Court otherwise. There, the defendant's employee handbook stated that the defendant "would not discriminate on the basis of race, sex, religion, or national origin" and that defendant was committed to a "fair and equitable working environment." *Id.* at 828. In conjunction with these statements, the handbook went on to "describe [ ] in detail three main tools [ ] used to determine salaries." *Id.* In light of these detailed salary guidelines which formed the crux of the plaintiff's claims, a division of the Colorado Court of Appeals held that sufficient evidence existed to create a question for the jury as to whether an implied contract existed. *Id.* But the division suggested that it would not have discerned sufficient evidence to support a finding of an implied contract absent the detailed salary and wage guidelines. *See id.* at 830

(Davidson, J., specially concurring) ("[O]ur decision . . . does not hold that the general language concerning equal employment opportunity for all in itself creates a contract . . . .").

Here, Plaintiffs do not allege that Defendants'[7] promises to treat AHCA members equally is accompanied by any other detailed guidelines or standards. Instead, the FAC merely alleges nebulous assurances, which are insufficient as a matter of law to state an implied contract claim. *Wright v. Ball Metalpack Corp.*, 2021 WL 12298860, at *2 (D. Colo. Aug. 24, 2021) ("[T]o the extent Plaintiff asserts Platinum's 'Business Practices' are sufficient to allege she had a contractual relationship with Platinum, they are not as a matter of Colorado law because the 'Business Practices' are nothing more than a statement of aspirational intent that does not constitute an implied contract as a matter of law."); *accord L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 125 F. Supp. 3d 1155, 1165 (D. Colo. 2015) (employee policy documents that contain vague assurances, guidelines, general guidance, generalized platitudes, and/or statements of aspirational intent do not constitute implied contracts as a matter of law).

Thus, the Court dismisses with prejudice Plaintiffs' contract claims. *See Vasey*, 29 F.3d at 1464 (affirming district court's directed verdict against plaintiff's breach of implied contract, express covenant of good faith and fair dealing, and promissory estoppel claims).

---

[7] Even were the Court to find that these promises were specific enough to allege an implied contract, the Court would still dismiss the contract claims against the Individual Defendants and Entity Defendants, as the Court perceives no allegations in the FAC that they had any contractual relationship with Plaintiffs.

### C. Tort Claims

Defendants contend that Plaintiffs' tort claims must be dismissed because they are time-barred by Colorado's statute of limitations and fail to state a claim. (ECF No. 117 at 10, 13.) Plaintiffs counter that their tort claims are timely under Vermont's statute of limitations, which controls here. (ECF No. 123 at 12.) Applying Colorado law, the Court dismisses the tort claims.

Colorado law generally requires tort claims—including intentional infliction of emotional distress, tortious interference, and trade libel—to "be commenced within two years after the cause of action accrues." § 13-80-102(1)(a), C.R.S. (2024). Defamation claims, however, must be brought within one year after the cause of action accrues. § 13-80-103(1)(a), C.R.S. (2024); *Dickerson v. Pub. Serv. Co. of Colorado*, 2016 WL 11295454, at *3 (D. Colo. Dec. 21, 2016) ("Defamation actions, on the other hand, are subject to a one-year statute of limitations under [section 13–80–103(1)(a)].").

Vermont law requires defamation and intentional infliction of emotional distress claims to be brought within three years after the cause of action accrues. 12 V.S.A. § 512; *Rennie v. State*, 171 Vt. 584, 586 (2000) (upholding district court's finding that intentional infliction of emotional distress claims are subject to a three-year statute of limitations). Tortious interference and trade libel claims appear to be subject to a six-year statute of limitations. *See* 12 V.S.A. § 511.

The Court finds—and Plaintiffs do not dispute[8]—that an outcome-determinative conflict of law exists between Colorado and Vermont law. Accordingly, the Court must

---

[8] While Plaintiffs assert that their contract claims are timely under both Colorado and Vermont law, they do not so argue with respect to their tort claims.

conduct a choice of law analysis.  *Richardson*, 637 F. Supp. 3d at 1190.

"Colorado follows the Restatement (Second) of Conflict of Laws (1971) . . . for both contract and tort actions."  *Kipling*, 774 F.3d at 1310 (citing cases); *accord BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089 (10th Cir. 1999) (federal courts exercising supplemental jurisdiction over state law claims in a federal question lawsuit apply the substantive law, including choice of law rules, of the forum state).  Section 6 of the Restatement provides that, absent a statute setting forth the governing law, courts should consider the following principles when determining which state's substantive law is applicable in a given case: (1) the needs of the interstate and international systems; (2) the relevant policies of the forum; (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability, and uniformity of result; and (7) ease in the determination and application of the law to be applied.  *See* Restatement (Second) of Conflict of Laws § 6(2) (Am. L. Inst.1971).

For both tort and contract claims, the Restatement sets forth a "most significant relationship" test under the principles articulated in section 6.  *See id.* § 145(1) ("The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.").  For tort claims, the relevant contacts in determining the state with the most significant relationship to the dispute include (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicil, residence, nationality,

place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. *Id.* § 145(2).

Applying these principles, the Court concludes that Colorado law governs the tort claims. The first factor is not very illuminating because Plaintiffs allege reputational harm, which can be said to have occurred in various locations throughout the country. (Indeed, AHCA members, like the parties, presumably live in several different states.) The second factor, however, certainly favors applying Colorado law, as Plaintiffs allege that Defendants' torts—including Defendants' defamatory statements—occurred in Denver, Colorado. (*See* ECF No. 96 at 11 (Plaintiff Seward attesting "that the Individual Defendants defamed Plaintiffs at an in-person AHCA Governance Committee meeting, held in Denver in 2018, by using their power within the AHCA to falsely allege complaints about IAFE Code violations by Plaintiffs had been received."); *see also id.* at 12 ("Plaintiffs explicitly allege that the Individual Defendants utilized the 2018 board meeting in Denver to advance those financial interests by undermining Plaintiffs' reputation.").) The third factor is not particularly significant, as the parties are citizens of Vermont, New York, Massachusetts, and Colorado. But most notably is the fourth factor, as the relationship between the parties is undoubtedly centered in Colorado. As mentioned, AHCA has its principal place of business in Colorado, where the parties have convened for many years to attend meetings and compete in various events. (*See* ECF No. 90 at 2 (recognizing that the AHCA sponsors the Stock Show in Denver, Colorado, which is the largest Highland cattle show in the United States).) On balance, then, the Court concludes that the choice of law analysis favors applying Colorado law.

Colorado law requires dismissal of Plaintiffs' tort claims. As discussed, the

allegedly defamatory statements and filing of fraudulent ethics complaints by

Defendants—both of which undergird all of Plaintiffs' tort claims—took place in 2018, at

least one year outside section 13-80-102 and section 13-80-103(1)(a)'s time

prescriptions.

Importantly, Plaintiffs do not dispute that their tort claims were filed outside

Colorado's applicable statutes of limitations.  (*See generally* ECF No. 123.)  Instead,

they argue only that the tort claims are timely under Vermont law and that the discovery

rule tolled the statute of limitations because "Defendants intentionally covered-up their

conduct" and were on notice of the tort claims by way of the initial lawsuit filed by

Plaintiffs against the AHCA in Vermont.  *See Shat Acres Highland Cattle, LLC v.

American Highland Cattle Association*, 2021 WL 2125357, at *15 (D. Vt. Jan. 1, 2021)

(dismissing Plaintiffs' initial lawsuit for lack of personal jurisdiction).  (*Id.* at 13.)

But Plaintiffs are not entitled to equitable tolling of the limitations period because,

as discussed, they allege that they discovered Defendants' tortious conduct on May 23,

2018, meaning that they had until May 23, 2019 or May 23, 2020 to file their tort claims.

Instead, Plaintiffs sued Defendants in this Court on May 17, 2021—at least one year

outside the statute of limitations.  *See Branch v. United Parcel Serv.*, 2019 WL

3940934, at *1 (D. Colo. Aug. 20, 2019) ("It is the plaintiff's burden to 'plausibly

establish' some form of entitlement to tolling or face dismissal under Fed. R. Civ. P.

12(b)(6)."); *accord Graham v. Teller Cty., Colo.*, 632 F. App'x 461, 463 (10th Cir. 2015)

("Under Colorado law, once a defendant asserts a statute-of-limitations defense, a

plaintiff bears the burden of establishing the statute should be tolled.").

Nor does the fact that Plaintiffs initially sued Defendants in Vermont save their

tort claims.  In that action, Plaintiffs sued only the AHCA, not the Individual Defendants or Entity Defendants.  *See Shat Acres Highland Cattle, LLC*, 2021 WL 2125357, at *1. Moreover, Plaintiffs did not allege any tort claims in that case.  *See id.* (alleging only violations of the SAA, VCPA, breach of the covenant of good faith and fair dealing, and breach of contract).  Hence, the Court fails to see how the Vermont lawsuit put Defendants on notice of the tort claims so as to toll the clock for those claims.

In sum, the Court dismisses with prejudice Plaintiff's tort claims.

### D.  VCPA Claim

Finally, Defendants move to dismiss the VCPA claim on the grounds that it is barred under Colorado's statutes of limitations and fails to state a claim.  (ECF No. 117 at 10, 16.)  Plaintiffs respond that their VCPA claim is timely under Vermont's six-year statute of limitations and under Colorado's three-year statute of limitations because the claim "sounds in contract."  (ECF No. 123 at 13.)  Plaintiffs argue that they sufficiently state a VCPA claim because "AHCA took anti-competitive action to devalue Plaintiffs' business . . . despite its representations that it would promote all members' business." (*Id.* at 20.)

The VCPA declares unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce."  9 V.S.A. § 2453(a).  The VCPA provides a private remedy for violations:

> *Any consumer* who . . . sustains damages or injury as a result of any false or fraudulent representations or practices prohibited by section 2453 of this title . . . may sue for appropriate equitable relief and may sue and recover from the seller, solicitor or other violator the amount of his damages . . . .

*Id.* § 2461(b) (emphasis added).  "Consumer" is defined by the VCPA as

> any person who purchases, leases, contracts for, or
> otherwise agrees to pay consideration for goods or services
> not for resale in the ordinary course of his or her trade or
> business but for his or her use or benefit or the use or
> benefit of a member of his or her household, or in connection
> with the operation of his or her household . . . .

*Id.* § 2451a(a).

Initially, the Court finds unavailing Plaintiffs' reliance on contract principals in support of their VCPA claim. The Court has already concluded that the FAC does not state an enforceable contract claim, implied or otherwise. Thus, the premise of Plaintiffs' VCPA claim is infirm.

Separately, the Court does not see in the FAC any allegation that Plaintiffs qualify as "consumers" under the VCPA. Nor do they argue they so qualify in their Response to the Motion, despite Defendants' argument that they are not consumers. *Doe v. Farmington Mun. Sch.*, 2022 WL 293141, at *4 (D.N.M. Feb. 1, 2022) ("[F]ailure to respond to an issue may constitute a waiver and therefore may warrant dismissal with prejudice."); *Castillo v. United Parcel Serv.*, 2008 WL 486082, at *2 (D. Colo. Feb. 19, 2008) ("[T]he Court deems the Plaintiff's failure to respond to be a waiver of the right to controvert those facts cited by the Defendant."). (ECF No. 117 at 17.) Plaintiffs appear to contend, rather, that they are suppliers, at least for purposes of this lawsuit. (*See, e.g.,* ECF No. 104 at 10 ("Shat Acres has been specifically recognized by all three members of Vermont's United States Congressional delegation *for their service to Vermont consumers* and their contribution to the Vermont economy.") (emphasis added).) Hence, the Court finds that Plaintiffs fail to state a VCPA claim.

Consequently, the Court dismisses with prejudice Plaintiffs' VCPA claim.

## V. CONCLUSION

For the reasons stated above, the Court ORDERS:

**1.**     Defendants' Motion (ECF No. 117) is GRANTED IN PART and DENIED
IN PART, as set forth above;

**2.**     Plaintiffs' state law claims are DISMISSED WITH PREJUDICE, as set
forth above;

**3.**     By **November 27, 2024**, the parties shall contact the chambers of United
States Magistrate Judge Timothy P. O'Hara to set a prompt scheduling
conference, or such other proceeding as Judge O'Hara determines is
appropriate to move this action forward.

Dated this 25th day of November, 2024.

BY THE COURT:

William J. Martínez
Senior United States District Judge